EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Aleicha Cruz Flores, et al<br><br>Peticionarios<br><br>v.<br><br>Hospital Ryder Memorial Inc., et al<br><br>Recurridos | Certiorari<br><br>2022 TSPR 112<br><br>210 DPR ____ |

Número del Caso:  CC-2019-445

Fecha: 2 de septiembre de 2022

Tribunal de Apelaciones:

   Panel III

Abogada de la parte peticionaria:

   Lcda. Michelle A. Ramos Jiménez

Abogada de la parte recurrida:

   Lcda. Teresa M. García Moll

Materia: Responsabilidad Civil Extracontractual – Deber de los hospitales de formular, adoptar y hacer cumplir aquellas políticas institucionales que garanticen la salud y bienestar de los pacientes, exigibles a la luz de la buena práctica de la medicina y que satisfacen las exigencias generalmente reconocidas por la profesión.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Aleicha Cruz Flores, et al<br><br>Peticionarios<br><br>v.<br><br>Hospital Ryder Memorial Inc., et al<br><br>Recurridos | CC-2019-0445 | *Certiorari* |

**Opinión del Tribunal emitida por el Juez Asociado señor RIVERA GARCÍA.**

En San Juan, Puerto Rico, a 2 de septiembre de 2022.

En esta ocasión tenemos la oportunidad de reiterar y especificar los contornos de la norma establecida en Márquez Vega v. Martínez Rosado, 116 DPR 397 (1985), sobre la adjudicación de responsabilidad civil extracontractual por impericia médica a las instituciones hospitalarias que incumplen con su obligación continua de velar por la salud y bienestar de los pacientes que se encuentran en sus facilidades. Además, en ese contexto, aclaramos el deber que tienen los hospitales de formular, adoptar y hacer cumplir aquellas políticas institucionales que garanticen la salud y bienestar de los pacientes, exigibles a la luz de la buena práctica de la medicina y que satisfacen las exigencias generalmente reconocidas por la profesión.

Particularmente, debemos resolver si determinado hospital incurrió en negligencia al no supervisar adecuadamente los actos claramente negligentes de un médico

al cual le concedió el privilegio de utilizar sus facilidades para atender a sus pacientes privados. **Respondemos esta interrogante en la afirmativa.** Así, concluimos que **el hospital incurrió en negligencia** al no tomar las medidas previsoras que prudente y razonablemente debía desplegar. Esto, en el contexto específico de este pleito, al omitir el cumplimiento con aquellas normas o políticas institucionales que prevén las consecuencias de determinados tratamientos empleados según la buena práctica de la medicina.

A continuación, exponemos los hechos que originaron el asunto ante nuestra consideración.

**I**

La génesis procesal de esta controversia se retrotrae al 22 de abril de 2015, fecha en la que la Sra. Aleicha Cruz Flores (señora Cruz Flores o peticionaria) y el Sr. Melvin Torres Peña (señor Torres Peña, en conjunto, peticionarios) incoaron una demanda de daños y perjuicios por impericia médica contra el Dr. Luis Flores Rivera (doctor Flores Rivera), ginecólogo obstetra, el Centro Médico al Cuidado de la Mujer P.S.C. y el Hospital Ryder Memorial Inc. (Hospital Ryder o recurrido) por la muerte de su hija, Abril L. Torres Cruz.

Según se desprende de la *Demanda*, la señora Cruz Flores comenzó el cuidado prenatal de su segundo embarazo en el Centro Médico al Cuidado de la Mujer bajo la supervisión del

doctor Flores Rivera.[1] El periodo prenatal de la peticionaria transcurrió con normalidad, ya que todos los sonogramas demostraron un crecimiento fetal adecuado. Como parte de sus visitas de rutina y monitoreo, el 30 de mayo de 2014, la peticionaria asistió a la oficina del doctor Flores Rivera donde este documentó que la señora Cruz Flores se encontraba en 35 y 4/7 semanas de gestación. También, señaló que, tras realizarle un examen pélvico, la peticionaria mostró un cuello uterino blando y un (1) centímetro de dilatación.[2] Así, le recomendó a la peticionaria regresar a su oficina el 2 de junio de 2014. Cumpliendo con esta recomendación, la peticionaria se presentó en la oficina del galeno alrededor de las 8:30 a.m. y este le realizó un examen pélvico en el que documentó que esta contaba con treinta y seis (36) semanas de embarazo y un (1) centímetro de dilatación. Empero, nada registró relativo a que la peticionaria tuviera contracciones. De igual forma, la señora Cruz Flores tampoco manifestó tener dolores ni contracciones. **Sin embargo, el doctor Flores Rivera la refirió al Hospital Ryder, para inducirle el parto**, ya que este se iba de vacaciones.[3]

---

[1] *Demanda,* Apéndice de la Petición de Certiorari, pág. 45.

[2] Íd., pág. 48.

[3] Íd. Cabe destacar que del expediente médico prenatal de la oficina del doctor Flores Rivera, **no se desprende la razón por la cual la peticionaria fue enviada al hospital, ya que para esa fecha el feto se encontraba aún en estado prematuro.** Tampoco surge que se hubiese obtenido un consentimiento informado de la señora Cruz Flores antes de enviarla al Hospital Ryder para la inducción del parto.

Ante tales circunstancias, y según se desprende del expediente médico del Hospital Ryder, la peticionaria fue admitida en esa institución el 2 de junio de 2014, a las 11:00 a.m. con un diagnóstico de treinta seis (36) semanas de embarazo intrauterino y se identificó como problema, dilatación sin dolor.[4] Además, se registró que esta fue admitida a la Sala de Parto a la 1:35 p.m. y acto seguido, se le colocó un monitor fetal. Durante este proceso, la señora Cruz Flores reiteró que no sentía ningún tipo de dolor o molestia.[5] Durante el periodo entre la 1:45 p.m. y las 6:50 p.m., el trazado fetal era completamente normal, con evidencia de un latido cardiaco fetal con buena variabilidad, sin evidencia de ninguna deceleración.[6]

Posteriormente, cerca de las 6:50 p.m., el doctor Flores Rivera se presentó a la Sala de Parto, examinó a la señora Cruz Flores **y determinó proceder a inducir el parto por lo cual rompió artificialmente la membrana amniótica**.[7] Al realizar dicho procedimiento, se percató que el líquido amniótico comenzó a salir color verde y con trozos de meconio[8] e inmediatamente le administró a la peticionaria una dosis de

---

[4] Íd., pág. 49. Véase, también, *Expediente de Admisión del Hospital Ryder*, Apéndice de la Petición de Certiorari, pág. 235.

[5] Íd.

[6] Íd., págs. 250-300.

[7] Véase, *Delivery Report*, Apéndice de la Petición de Certiorari, pág. 238.

[8] Para fines ilustrativos destacamos que el meconio es el material verdoso que se encuentra en el intestino del feto. Consiste en las secreciones del intestino y estómago, bilis, etc., y constituye las primeras deposiciones del recién nacido. Véase J.E. Schmidt, *Attorney's Dictionary of Medicine*, LexisNexis Matthew Bender.

cien (100) microgramos de Misoprostol[9] por el canal vaginal.[10] Luego de colocar el Misoprostol, a menos de media hora de esta intervención, la peticionaria comenzó a presentar dolor severo y contracciones constantes, a cada minuto.[11] Los latidos del feto comenzaron a disminuir, por lo que el doctor Flores Rivera ordenó una operación cesárea de emergencia.[12] Según consta en el expediente médico,[13] la cesárea tuvo que ser realizada debido a la presencia de meconio y ***fetal distress***.[14]

Así las cosas, ese mismo día, a las 7:57 p.m. nació Abril Torres Cruz (Abril), hija de los peticionarios, pesó 5 libras con 14 onzas y midió 18 pulgadas. Al momento de su nacimiento, la infante presentó un *Apgar Score* con una puntuación de siete (7) y pasados los cinco minutos aumentó a ocho (8).[15] No

---

[9] De manera similar, ilustramos que el Misoprostol es una prostaglandina que en el área de la obstetricia se utiliza para ablandar y dilatar el cuello uterino en casos como la inducción de un parto. También puede utilizarse para inducir abortos en embarazos tempranos donde el feto está muerto.

[10] Véase, *Orden Médica*, Apéndice de la Petición de Certiorari, pág. 242.

[11] Véase, *Labor Record-History and Physical Examination*, Apéndice de la Petición de Certiorari, pág. 237.

[12] Íd.

[13] *Expediente de Admisión del Hospital Ryder*, Apéndice de la Petición de Certiorari, pág. 235; *Labor Record-History and Physical Examination*, Apéndice de la Petición de Certiorari, pág. 237; *Delivery Report*, Apéndice de la Petición de Certiorari, págs. 238-239.

[14] De forma ilustrativa, el *fetal distress* o angustia fetal en el área de la obstetricia, es una condición peligrosa del feto que se identifica por signos y síntomas de respuestas anormales de órganos y funciones vitales. Véase J.E. Schmidt, *Attorney's Dictionary of Medicine*, LexisNexis Matthew Bender.

[15] Para fines ilustrativos destacamos que el *Apgar Score* es una evaluación de la condición física de los bebes recién nacidos al primer minuto y a los cinco minutos de nacer. Se le asigna un valor de 0 a 2 a cada uno de los cinco criterios a evaluar. Los criterios son: el ritmo cardiaco, la respiración, el tono muscular, respuesta a la estimulación y el color de piel. La puntuación máxima es de 10. El *Apgar Score* se

obstante, la menor tuvo que ser ingresada en la Unidad de Intensivo Neonatal del Hospital Ryder y fue diagnosticada como bebé prematura, y posteriormente, con sepsis, **hipertensión pulmonar arterial persistente** e incompatibilidad ABO. Ante ese diagnóstico crítico de salud, y a ocho (8) días después de su nacimiento, Abril tuvo que ser transferida al Hospital HIMA San Pablo de Caguas (Hospital HIMA).[16]

El 10 de junio de 2014, una vez admitida al Hospital HIMA, Abril fue diagnosticada con **hipertensión pulmonar severa**, fallo respiratorio, pulmonía, hemorragia pulmonar, disfunción cardiorrespiratoria, coagulopatía, anemia y convulsiones.[17] Consecuentemente, la infante dejó de orinar, no tenía percusión tisular y estaba bajo sedación.[18] Tras un tratamiento médico intensivo, el 14 de junio de 2014, esto es doce (12) días desde su nacimiento, Abril sufrió un arresto respiratorio y no respondió al masaje cardiaco ni a la epinefrina suministrada, por lo que falleció.[19]

Aproximadamente un año más tarde de ese suceso, el 27 de abril de 2015, los peticionarios radicaron la *Demanda* de

---

utiliza para conocer la condición del recién nacido. Véase J.E. Schmidt, *Attorney's Dictionary of Medicine*, LexisNexis Matthew Bender, 2003, Vol. 1 A-CG, pág. A-475.

[16] Véase, *Demanda,* Apéndice de la Petición de Certiorari, pág. 50. Además, la peticionaria expresó que durante esos siete (7) días la bebé "estaba cianótica, violetita, siempre estuvo entubada, como que le faltaba oxígeno. A veces se veía como que estaba recuperándose, pero al otro día estaba peor, tenía más mangas". Véase, *Transcripción de Juicio en su fondo*, Apéndice de la Petición de Certiorari, pág. 417.

[17] Véase, *Demanda,* Apéndice de la Petición de Certiorari, pág. 51.

[18] Véase, *Transcripción de Juicio en su fondo*, Vista del 31 de julio 2017, Apéndice de la Petición de Certiorari, pág. 479.

[19] Íd., pág. 493.

epígrafe y alegaron que los cuidados ofrecidos por el doctor Flores Rivera y el Hospital Ryder se apartaron de la buena práctica de la medicina y que esas desviaciones contribuyeron al cuadro clínico de hipertensión pulmonar persistente que desarrolló Abril, el cual provocó su muerte.[20] Asimismo, arguyeron que el doctor Flores Rivera se apartó de la buena práctica de la medicina al inducir el parto sin haber indicación médica para ello y al utilizar inadecuadamente el medicamento Misoprostol.[21] De igual forma, sostuvieron que el Hospital Ryder debía responder solidariamente por los daños sufridos al permitir que el doctor Flores Rivera indujera el parto y no supervisar o *monitorear* adecuadamente los actos de este.[22] Consistentemente, apuntalaron que el Hospital Ryder fue responsable solidariamente por los daños sufridos por los peticionarios, debido a los actos u omisiones negligentes de sus agentes, empleados y facultativos.[23] Por consiguiente, reclamaron una indemnización por los daños físicos y angustias mentales sufridos tanto por ellos como por su hija fallecida, incluyendo los daños físicos y angustias mentales sufridos por Abril durante los doce (12) días que antecedieron su muerte.[24]

---

[20] Véase, *Demanda,* Apéndice de la Petición de Certiorari, pág. 45.

[21] Íd.

[22] Íd., pág. 52.

[23] Íd. De igual modo, indicaron que el Centro Médico al Cuidado de la Mujer responde solidariamente por los daños sufridos debido a que los actos negligentes se llevaron a cabo por el doctor Flores Rivera estando en dichas facilidades. Íd.

[24] Íd. La indemnización reclamada fue por una suma no menor de un millón de dólares ($1,000,000.00) por los daños irreparables,

Así las cosas, el 3 de julio de 2015 el Hospital Ryder contestó la demanda.[25] En síntesis, negó la totalidad de su responsabilidad e indicó que cumplió con todos los estándares impuestos para el tratamiento de la peticionaria y su hija.[26] También, negó las alegaciones dirigidas a los diagnósticos y tratamientos ofrecidos por el doctor Flores Rivera, fundamentándose en el juicio clínico del médico en el manejo de su paciente obstétrica. Finalmente, **negó la negligencia y relación causal** respecto a los daños reclamados por los peticionarios. De igual modo, el doctor Flores Rivera y el Centro al Cuidado de la Mujer, afirmaron que los tratamientos ofrecidos cumplieron con la mejor práctica de la medicina.[27]

Luego de varios trámites procesales, el 26 de mayo de 2016, el doctor Flores Rivera y el Centro Médico al Cuidado de la Mujer suscribieron un *Acuerdo Privado de Transacción* en el cual estipularon su relevo de responsabilidad, luego del pago de noventa y cinco mil dólares ($95,000) a favor de los peticionarios.[28] Con igual objetivo, tanto los peticionarios

---

sufrimientos y angustias mentales por la muerte de su hija, además, a la pérdida de ingresos que ellos sufrieron. De igual forma, reclamaron una indemnización no menor de quinientos mil dólares ($500,000.00) por los daños físicos y angustias mentales que tuvo Abril durante el periodo de doce (12) días que antecedieron su fallecimiento.

[25] Véase, *Contestación a la Demanda del Hospital Ryder*, Apéndice de la Petición de Certiorari, pág. 56.

[26] Íd.

[27] Véase, *Contestaciones a la Demanda del doctor Flores Rivera y el Centro Médico de Cuidado de la Mujer*, Apéndice de la Petición de Certiorari, págs. 60 y 63.

[28] El 24 de junio de 2016 el foro de instancia dictó una *Sentencia* parcial declarando con lugar el desistimiento con perjuicio de las reclamaciones presentadas en contra del doctor Flores Rivera y el Centro Médico de Cuidado de la Mujer.

como el Hospital Ryder se cursaron ofertas y contraofertas transaccionales, pero no alcanzaron un acuerdo.

Ante esas circunstancias, se celebró el juicio en su fondo del 31 de julio al 2 de agosto de 2017. Durante el mismo, comparecieron como testigos, la señora Cruz Flores y el señor Torres Peña. Además, declaró la Dra. Basilisa Rivera Rodríguez, neonatóloga del Hospital HIMA[29], y el Dr. José A. Gratacós Díaz (doctor Gratacós Díaz)[30], perito de la parte peticionaria. Mientras que, como testigo y perito de la parte recurrida, compareció el Dr. Carlos A. Roure Llompart (doctor Roure Llompart).[31]

Luego de aquilatar la prueba pericial desfilada, el 1 de agosto de 2018, el foro primario dictó *Sentencia*. En síntesis, luego de realizar ciento cuarenta y tres (143) determinaciones de hechos, concluyó que el Hospital Ryder fue

---

[29] Conforme con el testimonio de la doctora Rivera Rodríguez, al momento de intervenir con la bebé esta tenía hipertensión severa pulmonar y su respuesta era pobre ante el tratamiento administrado. Además, relató que la bebé tenía una apariencia cianótica y su condición no mejoraba, lo cual provocó la muerte de la menor. Véase, *Transcripción de Juicio en su fondo*, Vista del 31 de julio 2017, Apéndice de la Petición de Certiorari, pág. 479.

[30] El doctor Gratacós Díaz lleva treinta y nueve (39) años en la profesión médica, con especialización en ginecología y obstetricia. Ha sido perito por espacio de treinta y ocho (38) años de su carrera. Está certificado por el Colegio Americano de Obstetras y Ginecólogos y por el Colegio de Médicos Cirujanos de Puerto Rico. Como parte de su experiencia profesional fue Director del Departamento de Medicina Materno-Fetal de la Escuela de Medicina. Véase, *Transcripción de Juicio en su fondo*, Vista del 31 de julio 2017, Apéndice de la Petición de Certiorari, pág. 519.

[31] El doctor Roure Llompart posee cuarenta (40) años de experiencia como ginecólogo obstetra, pero los últimos trece años se ha dedicado a la ginecología exclusivamente. Dirigió el Departamento de Obstetricia y Ginecología de la Escuela de Medicina y del Centro Médico de Rio Piedras, como también el Departamento de Obstetricia del Hospital Ashford Presbyterian. Véase, *Transcripción de Juicio en su fondo*, Vista del 2 de agosto 2017, Apéndice de la Petición de Certiorari, págs. 788-789.

responsable por los daños ocasionados a los peticionarios debido a su omisión en no tomar las medidas previsoras que un hombre prudente y razonable debía desplegar. Es decir, responsabilizó al Hospital Ryder **por no contar con los protocolos necesarios** ──recomendados por la literatura médica para la buena práctica de esa profesión── que hubieran detenido la cadena de eventos ocurridos el 2 de junio de 2014, los cuales ocasionaron la eventual muerte de Abril.

Particularmente, el foro de instancia adjudicó que el Hospital Ryder fue negligente al omitir y ejecutar las siguientes acciones: (1) al no tomar el consentimiento informado de la señora Cruz Flores para la inducción del parto según requerido en la literatura médica;[32] (2) al no tener un protocolo para el uso del medicamento Misoprostol; (3) al no procurar obtener el consentimiento informado de la peticionaria antes de suministrarle este medicamento, estando bajo el control y custodia del Hospital; y (4) al despachar el Misoprostol contraindicadamente, en una dosis cuatro (4) veces mayor de la aceptada.[33] Por consiguiente, concluyó que los actos y omisiones negligentes del Hospital Ryder fueron la causa adecuada de los daños sufridos por los

---

[32] No se desprende del expediente el consentimiento informado sobre la inducción del parto o la utilización de Misoprostol. Véase, *Expediente de Admisión del Hospital Ryder*, Apéndice de la Petición de Certiorari, pág. 235.

[33] Véase, *Sentencia*, Apéndice de la Petición de Certiorari, págs. 161-162.

peticionarios.[34] Inconforme, la parte recurrida solicitó reconsideración del dictamen, así como la inclusión de determinaciones adicionales de hechos y conclusiones de derecho, las cuales no fueron concedidas por el foro primario.

No conteste, el 5 de noviembre de 2018, la parte recurrida presentó un recurso de *Apelación* ante el Tribunal de Apelaciones.[35] En esencia, planteó que el foro primario

---

[34] Íd. Consecuentemente, el foro primario le imputó al Hospital Ryder un setenta por ciento (70%) de la responsabilidad y un treinta por ciento (30%) de responsabilidad al doctor Flores Rivera. A raíz de esta distribución de responsabilidad, el foro primario ordenó al Hospital Ryder el pago de: $304,970.72 por los daños y angustias mentales de la peticionaria, $304,970.72 por los daños y angustias mentales del señor Melvin Torres y $69,507.22 correspondientes a los doce (12) días que la bebé sufrió angustias mentales previo el deceso. Por su parte, también encontró negligente al doctor Flores Rivera, por inducir el parto a la peticionaria, utilizar un medicamento contraindicado y no explicarle los riesgos y consecuencias del uso de este.

[35] Por su larga extensión, resumimos los señalamientos de error presentados por el Hospital Ryder ante el tribunal apelativo de la manera siguiente:

Erró el Honorable Tribunal de Primera Instancia al:

(1)     distribuir los porcientos de responsabilidad;

(2)     determinar que el Hospital carecía de protocolos para el uso del medicamento Misoprostol;

(3)     determinar que la causa del fallecimiento de Abril obedeció a una ausencia de guías para la inducción de partos, así como guías de farmacia para evitar que el doctor Flores Rivera ordenara y administrara el Misoprostol/Cytotec de 100 microgramos;

(4)     imponer responsabilidad al Hospital Ryder aún cuando no se estableció el nexo causal requerido y aún cuando el perito de la demandante declaró que múltiples causas pudieron producir el desenlace;

(5)     apreciar la prueba pericial, aun cuando el perito de la demandante brindó testimonio contradictorio e inconsistente;

(6)     aquilatar la prueba pericial conforme al caso de *Dye Tfjc Puerto Rico, Inc. v. Royal Insurance Inc.*, 160 DPR 658 (2000);

(7)     apreciar toda la evidencia testifical y documental, omitiendo relacionar correctamente los hechos ocurridos conforme demostrados en el juicio; y apreciar los daños y sumas concedidas.

Véase, *Apelación*, Apéndice de la Petición de Certiorari, págs. 6-36.

erró al adjudicarle responsabilidad al Hospital Ryder por los daños causados a los peticionarios por la muerte de Abril. Argumentaron que la ausencia de protocolos no fue la causa adecuada de la muerte de Abril, sino, que fueron las decisiones del doctor Flores Rivera, al ejercer su juicio clínico como médico de la peticionaria, la causa directa y decisiva que ocasionó el daño. Oportunamente, el 5 de marzo de 2019, los peticionarios presentaron su *Alegato* en oposición. Particularmente, sostuvieron que el foro primario no cometió ninguno de los errores señalados y que la mayor parte de sus argumentos no están sustentados con la prueba declarada en juicio, no son fieles a los testimonios vertidos y más bien son inferencias del recurrido sobre la prueba presentada.

Trabada así la controversia entre las partes, el 29 de marzo de 2019, el Tribunal de Apelaciones dictó *Sentencia* y revocó la determinación del foro de instancia por entender que los peticionarios no probaron el nexo causal existente entre la omisión imputada al Hospital Ryder y los daños sufridos.[36] Estimó, que la prueba presentada demostró que fue el doctor Flores Rivera quien administró una dosis contraindicada de Misoprostol a la señora Cruz Flores, quien presuntamente estaba de parto y presentó meconio al romper fuente. Indicó, que fueron las actuaciones del doctor Flores

---

[36] Véase, *Sentencia*, Apéndice de la Petición de Certiorari, pág. 1206.

Rivera las que provocaron la necesidad de realizar una cesárea. Asimismo, determinó que la ausencia de protocolos en el hospital no fue el factor que desató la cadena de eventos que produjeron los daños, sino que, por el contrario, fue el juicio médico del doctor Flores Rivera, la causa adecuada que provocó los daños.

Contrario al *Informe pericial* y testimonio del doctor Gratacós Díaz, el foro intermedio expresó que los protocolos de un hospital no son los que educan a los ginecólogos obstetras sobre el uso de Misoprostol y sus posibles consecuencias. Además, adujo que "por lo que parece una transacción módica", el perito, es decir, el doctor Gratacós Díaz, ejecutó un cambio de teoría al indicar en su apéndice que el Hospital Ryder era responsable por la ausencia de protocolos. Razonó que como la ausencia de protocolos no fue el factor determinante que suscitó la cadena de eventos, es improcedente la adjudicación de responsabilidad al Hospital Ryder. **Por todo lo cual, concluyó que la responsabilidad debió recaer exclusivamente en el doctor Flores Rivera.**

Así las cosas, los peticionarios acuden ante esta Curia mediante recurso de *certiorari* y nos solicitan revocar el dictamen del Tribunal de Apelaciones y reinstalar el dictamen del Tribunal de Primera Instancia. En esencia, nos señalan que el foro intermedio erró al apreciar la prueba y determinar

que la ausencia de protocolos no guarda relación causal con los daños sufridos por los peticionarios.[37]

Luego de expedir el recurso de autos, y tras examinar los escritos de todas las partes, estamos en posición de resolver.

## II

De acuerdo con el Art. 1815 del actual Código Civil de 2020,[38] *infra*, la responsabilidad civil extracontractual se determinará por la ley vigente en el momento en que se suscitó el acto u omisión que causó daño a otro.[39] Por lo tanto, será

---

[37] Por su larga extensión, resumimos los señalamientos de error presentados por los peticionarios ante este Tribunal de la manera siguiente:

Erró el Honorable Tribunal de Apelaciones al:
  (1) determinar que el testimonio del doctor Gratacós Díaz fue contradictorio en torno al uso de Misoprostol y al concluir que el doctor Gratacós Díaz concuerda en que la peticionaria estaba de parto activo a las [6:00pm].
  (2) otorgar credibilidad al testimonio del Dr. Roure, en donde concluyó que no hubo stress fetal y al concluir que el testimonio del Dr. Roure fue más creíble, realista y razonable.
  (3) determinar que la ausencia de protocolos no guarda relación causal con los daños sufridos por los peticionarios y que "dichos protocolos poco podían aportar de haber existido, para evitar o remediar la situación, cuya nota discordante inicial fue la presencia de meconio al provocarle la ruptura de fuente".
  (4) concluir que la parte peticionaria desarrolló una nueva teoría para implicar civilmente al Hospital de manera injusta e infundada.

[38] 31 LPRA sec. 11720.
[39] Véase, *Pérez Hernández y otros v. Lares Medical Center Inc. y otros*, 2021 TSPR 123, 207 DPR ___ (2021).

de aplicación los preceptos del anterior Código Civil de 1930 (Código Civil) a la controversia ante nuestra consideración.[40]

A.      **Responsabilidad Civil Extracontractual**

i.    **Responsabilidad Propia: Art. 1802**

Conforme a nuestro ordenamiento jurídico en materia de responsabilidad civil extracontractual, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".[41] Es decir, los actos y omisiones en los que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que generan responsabilidad civil extracontractual.

Específicamente, para incoar una causa de acción bajo el Art. 1802, un demandante debe establecer: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado; y (3) el acto u omisión tiene que ser culposo o negligente.[42] Según ponderados estos requisitos, establecimos que la **culpa o negligencia consiste** en la falta del debido cuidado **en <u>no anticipar</u> y <u>prever</u> las consecuencias de un acto u <u>omisión</u>**, que una **persona prudente y razonable** habría de prever en las mismas circunstancias.[43] En ese

---

[40] 31 LPRA sec. 1, et seq. (derogado).

[41] 31 LPRA sec. 5141. (derogado).

[42] Véase, *Pérez Hernández y otros v. Lares Medical Center Inc.*, supra, pág. 8; *López y otros v. Porrata Doria y otros*, 169 DPR 135, 150 (2006).

[43] Íd. Véase, además, *Montalvo v. Cruz*, 144 DPR 748, 755 (1998). Así también definimos que "**[l]a culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso**". En ese sentido, la diligencia exigible es la que se espera del ser humano medio o la persona razonable, es decir, la del *buen padre de familia*. Íd., pág. 756 (citando a C. Rogel Vide, *La*

sentido, la negligencia por omisión surge al no **anticipar ni evitar** la ocurrencia de daños que racionalmente pudieron preverse.[44] Así, reiteradamente hemos sostenido que el **deber de previsión** es el criterio central para que se adjudique responsabilidad por culpa o negligencia.[45]

Ahora bien, el deber de previsión no se extiende a todo riesgo posible, más bien, se debe examinar si un daño pudo ser el resultado natural y probable de un acto negligente. Es decir, debemos evaluar si después del suceso, ponderado retrospectivamente, tal daño aparece como la consecuencia razonable y ordinaria del acto que se alega fue negligente.[46] Pues, la norma es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades.[47]

En sintonía con lo anterior, es requerido que entre dicho acto culposo o negligente y el daño sufrido deba existir un **nexo causal adecuado**. Esto es lo que en nuestro ordenamiento jurídico conocemos como la doctrina de la causalidad adecuada, la cual pregona que "no es causa toda condición sin la cual no se hubiera producido el daño, sino la que ordinariamente lo produce según la experiencia

---

*Responsabilidad Civil Extracontractual*, Madrid, Ed. Civitas, 1976, pág. 90).

[44] H.J. Brau del Toro, <u>Los daños y perjuicios extracontractuales en Puerto Rico</u>, San Juan, Pubs. T.T.S., 1986, Vol. 1, pág. 185. Véase, además *Miranda v. E.L.A.*, 137 DPR 700, 706 (1994); *Jiménez v. Pelegrina Espinet*, 112 DPR 700, 704 (1982).

[45] *Dworkin v. S.J. Intercont. Hotel Corp.*, 91 DPR 584, 587 (1964).

[46] *Montalvo v. Cruz*, supra, pág. 756-757.

[47] *López y otros v. Porrata Doria y otros*, supra, págs. 164-165.

general".[48] De manera que, para surgir el elemento del nexo causal, debe de existir una relación entre el daño y la consecuencia razonable, común y natural de la acción u omisión imputada al autor demandado.[49] Por lo tanto, es esa relación directa la que permite concluir que el acto torticero imputado es la causa adecuada del daño reclamado.[50]

### ii. Responsabilidad Vicaria: Art. 1803

Como norma general, la doctrina de responsabilidad vicaria postula que la responsabilidad impuesta por el Art. 1802 no se extiende tan solo a los actos u omisiones propios, sino a los de aquellas personas por las cuales se debe responder, siempre que con la culpa o negligencia de estas concurra la del principal, la cual se presume. De manera excepcional nuestro Código Civil establece varias situaciones en las que ciertas personas están llamadas a responder por hechos ajenos a sí. El Art. 1803 dispone que

> [l]a obligación que impone [el Art. 1802] es exigible, no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.
> (........)
> **Lo son igualmente los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados, o con ocasión de sus funciones.**
> (........)
>
> La responsabilidad de que trata esta sección cesará cuando las personas en ella mencionadas prueben que

---

[48] *Soc. de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974).
[49] *Montalvo v. Cruz*, supra, págs. 756-757.
[50] Íd.

emplearon toda la diligencia de un buen padre de familia para prevenir el daño. (Énfasis suplido).[51]

El precitado artículo constituye una excepción especial al principio de la responsabilidad personal por los actos propios y solo puede aplicarse a los casos incluidos específicamente en el mismo. De igual forma, establece una presunción legal de responsabilidad de las personas citadas en él, pues, en atención a las relaciones de autoridad o superioridad que mantienen con los autores del daño causado, la ley presume que le es imputable la causa de aquel por su propia culpa o negligencia.

De esta forma el Código Civil responsabiliza a los patronos por los daños que ocasionen sus empleados en el ejercicio de su trabajo.[52] Sin embargo, el referido artículo permite al patrono liberarse de esta responsabilidad si demuestra que empleó toda la diligencia de un buen padre de familia. Por lo tanto, el Art. 1803 establece una presunción legal de que la culpa o negligencia es del patrono por no ejercer la debida diligencia para evitar el daño ocasionado por su empleado, salvo se pruebe lo contrario. Ello, por este no haber demostrado el cuidado o la vigilancia necesaria para evitar que aquellos dieran lugar al daño causado.[53] A esta forma de culpa es a la que tradicionalmente se le conoce como

---

[51] 31 LPRA sec. 5142 (derogado).

[52] Véase, *Pérez Hernández y otros v. Lares Medical Center Inc.*, supra, pág. 8. Véase, también, *Blás Toledo v. Hospital Nuestra Señora de la Guadalupe*, 146 DPR 267, 324 (1998); *Roses v. Julia*, 67 DPR 518, 527-28 (1947).

[53] *García v. E.L.A.*, 163 DPR 800, 811 (2005).

la culpa *in vigilando, in instruendo* o *in eligiendo* del patrono.[54] Es decir, que, de haber sido el patrono diligente en vigilar, instruir o escoger a sus empleados, el daño no hubiese ocurrido.

**B. Responsabilidad por impericia médica**

En Puerto Rico la responsabilidad civil extracontractual por impericia médica tradicionalmente se impone por la culpa o negligencia de un facultativo médico según emana del Art. 1802.[55] Ese racional máximo surge de la norma mínima de cuidado médico exigible a la luz de los modernos medios de comunicación y enseñanza y **conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, que satisfacen las exigencias generalmente reconocidas por la profesión.**[56]

Sin embargo, hoy día es una incuestionable realidad que una persona que requiere atención médica tiene la alternativa de elegir entre la oficina de un médico privado o recurrir directamente a una institución hospitalaria.[57] Ello, ha sido así por la importancia de estas instituciones al proyectarse

---

[54] *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 907 (2012).

[55] *López v. Dr. Canizares*, 163 DPR 119, 132 (2004). A tales efectos, es responsabilidad de los médicos "'brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza', y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, 'satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica'. Íd. pág. 133.

[56] *López v. Hosp. Presbiteriano, Inc.*, 107 DPR 197 (1978*); Negrón v. Municipio de San Juan*, 107 DPR 375 (1978); *González v. E.L.A.*, 104 DPR 55, 60-61 (1975).

[57] *Márquez Vega v. Martínez Rosado*, 116 DPR 397 (1985).

hacia la comunidad como centros de tratamiento médico integral en el cuidado de la salud. Por consiguiente, esto ha provocado una alta regulación por parte del Estado respecto a la responsabilidad que tienen los hospitales en relación con los pacientes y los actos de mala práctica profesional ocurridos dentro de sus facilidades.[58]

Cónsono con lo anterior, este Tribunal reconoció que **las <u>instituciones hospitalarias</u> tienen el deber de ofrecer el grado de cuidado que ejercería un <u>hombre prudente y razonable</u> en circunstancias similares.**[59] Es decir, hemos validado que los hospitales deben ejercer el cuidado y las medidas previsoras que una persona razonablemente prudente desplegaría ante determinadas situaciones, utilizando como criterio la buena práctica generalmente reconocida por la profesión. De modo que establecimos que la responsabilidad de los hospitales no es absoluta. Los hospitales no tienen la obligación de prever todo peligro imaginable, pues se limita a aquellos riesgos que con algún grado de probabilidad serían anticipables para una persona prudente y razonable.

Ahora bien, la tendencia actual para la imposición de responsabilidad a los hospitales no sólo surge por los actos negligentes cometidos por los médicos empleados y agentes de

---

[58] *Hannola v. City of Lakewood*, 426 N.E. 2d 1187 (Ohio App. 1980); *Beeck v. Tucson General Hospital*, 500 P.2d 1153 (Ariz. App. 1972); *Ybarra v. Spangard*, 154 P.2d 687 (Cal. 1944).

[59] Núñez v. Cintrón, 115 DPR 598, 617 (1984); *Crespo v. H. R. Psychiatric Hosp., Inc.*, 114 DPR 796, 800 (1983); *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960).

los mismos bajo la doctrina de *respondeat superior*, sino que el hospital puede resultar responsable ante el paciente bajo la llamada doctrina de **responsabilidad corporativa**.[60] Esto es, por los actos negligentes cometidos por médicos a quienes el hospital meramente le concedió el **privilegio** de utilizar sus facilidades para atender a sus pacientes privados.[61]

Por su parte, si el daño es causado por un empleado del hospital, el hospital responderá solidariamente con el empleado por razón de la responsabilidad vicaria impuesta por el Art. 1803 del Código Civil. Veamos.

### i. Responsabilidad Vicaria de los hospitales

El Art. 1803 dispone que, en cuanto a la responsabilidad que alude el Art. 1802, también responden los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus empleados en el servicio que ofrecen o con ocasión de su función.[62] En el caso de las instituciones hospitalarias, "el incumplimiento de ese deber por el personal del hospital conlleva responsabilidad extracontractual de la institución hospitalaria frente al perjudicado".[63]

En nuestro ordenamiento jurídico, la norma vigente en cuanto a la responsabilidad de los hospitales se estableció en Hernández v. La Capital, 81 DPR 1031 (1960). En ese

---

[60] *Márquez Vega v. Martínez Rosado*, supra, pág. 403.

[61] Íd.

[62] 31 LPRA sec. 5141 (derogado).

[63] *Núñez v. Cintrón*, 115 DPR 598, 613 (1984) (citando a *Roses v. Julia*, 67 DPR 518 (1947)).

momento, resolvimos que un hospital sí responde por aquellos daños causados por actos de comisión u omisión realizados por sus empleados y funcionarios y comprendidos en el ámbito de sus funciones. Apuntalamos que una institución hospitalaria tiene el deber de ofrecer al paciente el cuidado y la atención razonable que las circunstancias exigen, y que estos se miden por normas de razonabilidad y prudencia. Particularmente, también indicamos que las prácticas prevalecientes en la profesión pueden servir de índice en esta función.

Ahora bien, al momento de adjudicar responsabilidad vicaria a los hospitales por los actos de los médicos que laboran en su institución, es importante considerar la relación jurídica existente entre estos.[64] En primer lugar, el hospital responde vicariamente por los actos de aquellos médicos que son sus empleados.[65] De igual forma, el hospital responde vicariamente por aquellos médicos, que, aunque no forman parte de su fuerza laboral, son parte de la facultad o *staff,* encontrándose disponibles para consultas de otros médicos.[66] En tercer lugar, responden vicariamente los hospitales en casos de impericia por los médicos pertenecientes a concesionarios de franquicias exclusivas para prestar servicios en el hospital.[67] Por último, responden

---

[64] *Fonseca v. Hosp. HIMA*, 184 DPR 281, 288 (2012).

[65] Íd., pág. 289 (citando a *Márquez Vega v. Martínez Rosado*, supra, 116 DPR 397 (1985)).

[66] Íd. Véase, además, *Núñez v. Cintrón*, 115 DPR 598 (1984)).

[67] Íd. (citando a *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 515-16 (2009)).

los hospitales por **aquellos médicos** que sin ser empleados **gozan de privilegios** en la institución.[68] **<u>No obstante, en estos casos, donde la víctima de impericia es un paciente privado del médico con privilegios, el hospital solo responde por su propia negligencia y no vicariamente</u>**. Pertinente a la presente controversia de autos, veamos en detalle esta última circunstancia.

### ii. Responsabilidad Propia de los hospitales

Consistentemente esta Curia ha expresado que las instituciones hospitalarias tienen el deber de ofrecer el grado de cuidado que ejercería un hombre prudente y razonable en circunstancias similares.[69] Hemos reiterado que la "'visión tradicional de concebir a un hospital como simplemente una estructura dotada de facilidades físicas, personal y equipo para la práctica del arte de la medicina se ha ido desvaneciendo', y que desde 'años recientes el deber de cuidado hacia el paciente no sólo corresponde a su médico sino al hospital'".[70] Por consiguiente, las instituciones hospitalarias y su junta administrativa tienen el deber de vigilar que los mecanismos utilizados con los pacientes sean establecidos de manera segura y cuidados celosamente.[71] Es decir, el deber de cuidar al paciente no sólo corresponde a

---

[68] Íd. *Márquez Vega v. Martínez Rosado,* 116 DPR 397 (1985)).

[69] *Núñez v. Cintrón*, supra; *Crespo v. H. R. Psychiatric Hosp., Inc.*, 114 DPR 796 (1983); *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960).

[70] *Núñez v. Cintrón*, supra.

[71] Íd. (citando a *Hernández v. Asoc. Hosp. del Maestro,* 106 DPR 72, 80, 81 (1977).

su médico, sino al hospital como institución. En ese sentido, esta Curia solo se ha expresado en una sola ocasión sobre la responsabilidad de los hospitales por aquellos médicos que sin ser empleados gozan de privilegios en la institución.

De manera congruente, en Márquez Vega v. Martínez Rosado, 116 DPR 397 (1985), resolvimos que se puede responsabilizar a los hospitales por los actos negligentes cometidos por los médicos a quienes el hospital les concedió el privilegio de utilizar sus facilidades para atender a sus pacientes privados.[72] De esta forma, adoptamos la **doctrina de responsabilidad corporativa**, con relación a la adjudicación de responsabilidad civil extracontractual de los hospitales. Establecimos que, bajo esta doctrina, un hospital es responsable si no cumple con **la obligación continua de velar por la salud de los pacientes y garantizar su seguridad y bienestar mientras está en el hospital.**[73] Sostuvimos que se les exige esta obligación a los hospitales por razones de política pública. Por lo tanto, ello crea un deber indelegable que el hospital le debe directamente al paciente. A esos fines, establecimos que las instituciones hospitalarias deben velar por el bienestar de sus pacientes a través de:

> (a) una cuidadosa selección de los médicos a quienes, en la forma que sea, les ha conferido el privilegio de utilizar sus facilidades; (b) exigiendo que dichos médicos se mantengan al día a través de cursos de mejoramiento profesional; **(c) "manteniéndose al tanto" (monitoring) del trabajo de los referidos médicos e interviniendo, cuando**

---

[72] *Márquez Vega v. Martínez Rosado*, 116 DPR 397 (1985).
[73] Íd., pág. 409.

**ello sea posible, ante un acto obvio de impericia médica por parte de los mismos**; (d) descontinuando el privilegio concedido ante repetidos o crasos actos de mala práctica por parte de uno de esos médicos; y (e) manteniéndose razonablemente al día en cuanto a los adelantos tecnológicos habidos. (Énfasis Suplido).[74]

Conforme la norma establecida en este caso, un hospital que en la práctica no actúe así es responsable, por complicidad, del acto de impericia médica cometido en sus facilidades por el doctor con su paciente privado. Máxime, cuando la tendencia moderna es a considerar que el deber de cuidado hacia el paciente no sólo corresponde a su médico sino también al hospital.[75] Como mencionáramos, la responsabilidad del hospital sobre los actos de un médico no empleado no es absoluta, pues depende de que el hospital incurra en negligencia y que no haya desplegado el grado de cuidado que ejercería un hombre prudente y razonable. Sin embargo, en Márquez Vega v. Martínez Rosado, *supra*, el Tribunal desestimó la demanda presentada en contra del hospital debido a que no se estableció la negligencia del hospital al observar esta obligación.

### C.   Consentimiento Informado

Sabido es que para llevar a cabo un procedimiento médico-quirúrgico, tratamiento u otro procedimiento médico, que resulte invasivo al cuerpo humano, **es un elemento indispensable requerir el <u>consentimiento informado y expreso</u>**

---

[74] Íd., págs. 409-10.

[75] Íd.

**del paciente previo a ejecutar tal acción.**[76] Tal precepto surge del derecho a la intimidad consagrado expresamente en nuestra Constitución.[77] Este Tribunal ha resuelto en reiteradas ocasiones que, como corolario de este derecho, los doctores tienen la obligación de obtener el consentimiento informado de sus pacientes previo a emplear cualquier tratamiento o intervención quirúrgica.[78] El concepto del consentimiento informado les impone a los médicos la obligación de ofrecer a sus pacientes toda la información que sea indispensable para comprender la naturaleza de ciertos procedimientos, lo que debe incluir datos de sus beneficios, riesgos y posibles complicaciones.[79]

De esta forma, establecimos que el médico deberá divulgar tanto los riesgos razonablemente previsibles, como los beneficios del tratamiento o procedimiento invasivo. Además, deberá informar sobre las alternativas disponibles y sobre los riesgos probables en caso de que el paciente opte por no tratarse la condición.[80] Es decir, el estándar que adoptamos "acarrea para el médico el deber de informar aquellos riesgos, conforme lo establecido por la práctica prevaleciente de la medicina".[81] De manera que, este estándar

---

[76] Salvo las situaciones excepcionales de emergencia y perjuicio al estado psicológico de aprehensión del paciente. *Rodríguez Crespo v. Hernández*, supra, pág. 664; *Rojas v. Maldonado*, 68 DPR 818, 827 (1948).

[77] Art. II, Sec. 8, Const. de PR, 1 LPRA.

[78] *Martínez Marrero v. González Droz*, 180 DPR 579, 593 (2011).

[79] Íd.

[80] *Rodríguez Crespo v. Hernández*, supra, págs. 663-664.

[81] *Sepúlveda De Arrieta v. Barreto*, 137 DPR 735, 743 (1994).

del "profesional de la medicina" es cónsono con las normas y principios civilistas prevalecientes en Puerto Rico, específicamente, con la doctrina de la causalidad adecuada, predicada en "la causalidad legal entre la acción u omisión negligente y el daño sufrido".[82]

En ese sentido, determinamos que la cadena causal entre la omisión del médico al informar, y la materialización del riesgo no divulgado, debe cumplir con dos (2) requisitos: (1) la falta de divulgación debió haber causado que el paciente consintiera al procedimiento propuesto y (2) el procedimiento le debió haber causado daño al paciente.[83] Así pues, los elementos esenciales en una reclamación por daños y perjuicios basados en una alegación de impericia médica, por no obtener el médico un consentimiento informado, antes de efectuar una operación o tratamiento, son: (1) determinar si el médico tenía el deber de divulgar determinada información; (2) determinar la información específica que debió ser divulgada y (3) determinar si la causa próxima del daño alegado fue la falta de divulgación de los riesgos implícitos en dicha operación o tratamiento.[84]

### D. Prueba Pericial

La Regla 702 de Evidencia expone que una persona capacitada como perito podrá testificar cuando algún conocimiento científico, técnico o especializado sea

---

[82] *Hernández Rivera v. Mun. De Bayamón*, 135 DPR 901, 925 (1994).

[83] *Sepúlveda De Arrieta v. Barreto*, supra, págs. 756-757.

[84] Íd.

necesario para ayudar al juzgador a comprender la controversia.[85] De igual modo, establece que el valor probatorio dependerá de: (a) si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables; (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (e) las calificaciones o credenciales de la persona testigo; y (f) la parcialidad de la persona testigo.[86]

Asimismo, la Regla 703 de Evidencia regula lo correspondiente a la calificación de los peritos y dispone que toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio.[87] Al momento de catalogar a una persona como perito, no se requiere que el testigo posea cierto tipo de credenciales académicas o profesionales, pues basta con tener experiencia en la materia particular, que pueda ser de ayuda al juzgador.[88]

En Pueblo v. Echevarría, 128 DPR 299, 334 (1991), esta Curia determinó que no es un requisito que el perito tenga

---

[85] R. Evid. 702, 32 LPRA Ap. IV (2010).
[86] Íd.
[87] R. Evid. 702, 32 LPRA Ap. IV (2010).
[88] Ernesto L. Chiesa Aponte, Reglas de Evidencia Comentadas 243 (2016).

una licencia específica para que su testimonio sea aceptado como pericial. Sin embargo, el hecho de "que existe liberalidad en cuanto a la capacidad pericial . . . no significa que la mayor o menor competencia del perito sea irrelevante para apreciar su *valor probatorio*".[89] Por consiguiente, la ausencia de credenciales suficientes puede afectar el valor probatorio del testimonio pericial.[90] Cuando se trata de casos minuciosos, como lo son las controversias de impericia médica, "la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio".[91] En cuanto a la apreciación de la prueba en general, sabido es que **la norma general** y reiterada por esta Curia **es una de deferencia hacia los Tribunales de Primera Instancia** a menos que se perciban rastros de pasión, prejuicio, parcialidad o error manifiesto.[92]

No obstante, en lo que respecta al testimonio pericial, existe una excepción a la norma anterior, que le concede a los foros apelativos amplia discreción al momento de evaluar la prueba pericial.[93] Consecuentemente, en Diaz v. Pneumatics & Hydraulics este Tribunal expresó que "[t]enemos plena

---

[89] *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico*, 150 DPR 658, 663-64 (2000) (citando a Chiesa, *Tratado de derecho probatorio: reglas de evidencia de Puerto Rico y federales, op. cit.*, pág. 593).

[90] Íd.

[91] *Dye-Tex Puerto Rico, Inc*, 150 DPR en la pág. 664 (citando a Chiesa, *Tratado de derecho probatorio: reglas de evidencia de Puerto Rico y federales, op. cit.*, pág. 594.). Véase, también, *Vda. de Torres v. Womble*, 99 DPR 859, 870 (1971).

[92] *Suárez v. Com. Estatal de Elecciones*, 176 DPR 31, 65 (2009).

[93] *González Rivera v. Junta de Retiro para Maestros*, 93 DPR 70, 78 (1966).

libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Incluso, podemos descartarla, aunque resulte técnicamente correcta".[94] Por consiguiente, los foros revisores poseen la facultad de examinar y evaluar la prueba pericial según estimen prudente.

**E.    Alcance del descubrimiento de prueba**

Según establece la Regla 23.1 de Procedimiento Civil

> [l]as partes podrán hacer descubrimiento sobre **cualquier materia**, no privilegiada, **que sea pertinente al asunto en controversia** en el pleito pendiente, ya se refiera a la reclamación o defensa de cualquier otra parte, incluso la existencia, descripción, naturaleza, custodia, condición y localización de cualesquiera libros, información almacenada electrónicamente, documentos u otros objetos tangibles y la identidad y dirección de personas que conozcan hechos pertinentes. No constituirá objeción el que la información solicitada sea inadmisible en el juicio, siempre que exista una probabilidad razonable de que dicha información conduzca al descubrimiento de evidencia admisible.[95]

Ha sido norma reiterada bajo este ordenamiento que el descubrimiento de prueba será uno **amplio y liberal**.[96] Es por esto que nuestro ordenamiento solo restringe el descubrimiento de prueba bajo dos (2) preceptos: (1) que la información objeto del descubrimiento no sea privilegiada y (2) que la misma sea pertinente a la controversia.[97]

Sobre este particular, el tratadista José Cuevas ha señalado lo siguiente:

---

[94] *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006).
[95] Regla 23.1 de Procedimiento Civil.
[96] *Rivera y Otros v. Bco. Popular*, 152 DPR 140, 152 (2000).
[97] Íd.

> "**El descubrimiento** es punto de arranque en la investigación y lo descubierto **sirve de base para descubrimiento adicional**, según surja de lo descubierto de primera intención. Por esa razón, un solo interrogatorio es muy rara vez suficiente, **pues lo descubierto abre las puertas a preguntas adicionales**…". (Énfasis Suplido).[98]

Así las cosas, hemos expresado que los tribunales de instancia tienen amplia discreción para regular el ámbito del descubrimiento, pues es su obligación garantizar una solución justa, rápida y económica del caso, sin ventajas para ninguna de las partes.[99] Consistente con lo anterior, también hemos aludido que

> **[n]o hemos de interferir con los tribunales de instancia en el ejercicio de sus <u>facultades discrecionales</u>**, excepto en aquellas situaciones en que se demuestre que este último (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.[100]

**F. Valoración de daños y porcentaje de responsabilidad**

En acciones de daños y perjuicios resulta ser una tarea difícil y angustiosa la estimación y valoración de daños, ya que conlleva cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia

---

[98] José A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* Tomo I, Ed.2000, pág. 501.

[99] *Rivera y Otros v. Bco. Popular*, 152 DPR 140, 152, (2000) (citando a *Martínez Rivera v. Tribunal Superior*, 85 DPR 1, 13 (1962)). Véanse, también: *Machado Maldonado v. Barranco Colón*, 119 DPR 563, 566 (1987); *Rivera v. Tribunal Superior*, 99 DPR 276, 278 (1970).

[100] Íd. (citando a *Lluch v. España Service Sta.*, ante, pág. 745).

del juzgador de los hechos.[101] Asimismo, este Tribunal ha

reiterado que

> dado que el foro de instancia es quien ha estado
> en contacto directo con la prueba —en especial la
> prueba testifical— **los tribunales apelativos**
> **deberán abstenerse de intervenir respecto a las**
> **cantidades concedidas** a menos que éstas sean
> ridículamente bajas o exageradamente altas, **ello**
> **fundado en criterios de estabilidad y de respeto**
> **a los tribunales de primera instancia.** (Énfasis
> Suplido).[102]

No obstante, de entender que las circunstancias

ameritan una modificación debido a algún perjuicio, error

manifiesto o parcialidad, el foro revisor procederá a

realizarla basándose en su sano juicio, experiencia y

discreción como juzgador.[103] Así, esta Curia expresó que es

una norma reiterada en nuestro ordenamiento que los foros

revisores deben abstenerse de

> **intervenir con la apreciación de la prueba y la**
> **determinación de daños que un foro de instancia**
> **haya emitido.** Así, pues, es norma clara que en
> deferencia y respeto a los foros de instancia, y
> en pro de la estabilidad, los tribunales
> apelativos solamente tienen la
> facultad de modificar las cuantías concedidas en
> aquellos casos en que "sean ridículamente bajas
> o exageradamente altas".[104]

## III

En el caso ante nuestra consideración, en esencia,

tenemos que determinar si el Hospital Ryder cumplió con su

---

[101] *Santiago* Montañez *v. Fresenius* Medical, 195 DPR 476 (2016); *S.L.G. Rodríguez v. Nationwide*, 156 DPR 614, 622 (2002).

[102] *S.L.G. Rodríguez v. Nationwide*, supra, citando a *Urrutia v. A.A.A.*, 103 DPR 643, 647 (1975).

[103] Íd.

[104] *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 509-10(2009).

**obligación continua de velar por la salud y bienestar** de la peticionaria y su hija Abril. Como adelantamos, **respondemos en la negativa.** Concluimos que el Hospital Ryder no tomó las medidas previsoras que un hombre prudente y razonable debía desplegar e **incumplió con el estándar adecuado de atención que se le debe al paciente**, en aras de garantizar su seguridad y bienestar mientras está en el hospital.

Ahora bien, la controversia ante nuestra consideración nos exige ⸻*como parte integral del análisis*⸻, sopesar y ponderar las acciones que realizó tanto el Hospital como el Doctor, para poder disponer de la misma de una forma responsable. Veamos.

Los peticionarios argumentan en su *Petición de Certiorari* que el foro intermedio erró en su evaluación de la prueba.[105] En síntesis, arguyen que la ausencia de protocolos representa la causa adecuada de los daños sufridos por los peticionarios y su hija. Es decir, aducen que si estos protocolos o guías hubieran existido y hubieran sido seguidos por el Hospital Ryder, se habría evitado la inducción del parto, el uso contraindicado y excesivo del medicamento Misoprostol y la consecuente muerte de Abril. Los peticionarios sostienen, además, que la presencia de meconio no fue la causa principal de la hipertensión pulmonar de Abril, sino que fueron varios factores, en conjunto, los

---

[105] Véase, Petición de Certiorari, págs. 1-35.

causantes de la hipertensión pulmonar.[106] A saber: (1) un parto inducido, (2) *fetal distress*, (3) meconio, y (4) el estado prematuro del infante.[107] Precisan que el caso de epígrafe presentó todos estos factores, a saber, la bebé era prematura, el parto de la peticionaria fue inducido con una sobredosis de un medicamento contraindicado y Abril sufrió *fetal distress*. Arguyen que esto se desprende inequívocamente del expediente médico.

Por su parte, el Hospital Ryder destaca en su *Alegato*, que: (1) no hubo prueba del nexo causal entre las imputaciones formuladas en su contra y el desenlace del caso, y (2) que no debió merecer crédito el testimonio del perito, doctor Gratacós Díaz, por tratarse, presuntamente, de una opinión parcializada, que carece de bases para sustentar la misma. Afirma que el testimonio de su perito, el doctor Roure Llompart, fue consistente en la interpretación de la prueba médica. En ese sentido, sostiene que según se desprende del testimonio del doctor Roure Llompart, en este caso no se hizo una inducción del parto sino un aumento de parto. De forma similar, el recurrido arguye que la decisión de utilizar el Misprostol fue producto del juicio clínico del doctor Flores Rivera, por lo que representa una exclusiva y entera responsabilidad de este como obstetra. Referente a la ausencia de consentimiento informado ──tanto para la inducción

---

[106] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto 2017, Apéndice de la Petición de Certiorari, pág. 694.

[107] Íd.

del parto como para el uso de Misoprostol— alega que también es responsabilidad del doctor Flores Rivera obtenerlo y no es delegable al personal de enfermería del Hospital Ryder.

Por estar íntimamente relacionados, consideraremos conjuntamente los señalamientos de error de los peticionarios.

Primeramente, para establecer si el Hospital Ryder tiene algún grado de responsabilidad por los daños ocasionados en el caso de autos, es indispensable puntualizar el tipo de relación jurídica que existe entre este y el doctor Flores Rivera. Según surge de los hechos del caso, el doctor Flores Rivera posee privilegios en el Hospital Ryder, por lo que no se le cataloga como un empleado de la institución hospitalaria. Así las cosas, la responsabilidad del Hospital Ryder ante los actos del doctor Flores Rivera no es absoluta, pues solo responde por sus propios actos negligentes y no vicariamente. No obstante, según se desprende de la demanda y los hechos del caso, los peticionarios responsabilizaron al Hospital Ryder por los daños sufridos, al permitir que el doctor Flores Rivera indujera el parto y al **no supervisar** adecuadamente los actos de este. Consistentemente, apuntalaron que el Hospital Ryder fue responsable solidariamente por los daños sufridos por los peticionarios, debido a los actos u omisiones negligentes de sus agentes, empleados y facultativos.

De entrada, al analizar la prueba en el caso de autos, encontramos el testimonio del perito de los peticionarios, el doctor Gratacós Díaz. Este declaró que evaluó el expediente médico de la señora Cruz Flores y que **no existía indicación de que esta tuviera contracciones.**[108] **Además, opinó que a las treinta y seis (36) semanas de embarazo, la bebé aún era prematura.** Sobre el consentimiento requerido para un proceso de inducción de parto, el galeno expresó:

> P. ¿Qué consentimiento, alguno, debía aparecer si la paciente iba ser enviada al hospital para parto?
>
> R. **Si yo envió a la paciente al hospital para una inducción de parto, tiene que haber un consentimiento escrito** donde se le explica al paciente la razón para la inducción de parto, las alternativas que hay. La paciente puede decirme, "No quiero que me induzca el parto" Y tiene su derecho. **Hay que explicarle por qué le voy a inducir y hay que decirle cuáles son los riesgos de la inducción del parto**". (Énfasis suplido).[109]

Como se puede apreciar, esta responsabilidad **recae exclusivamente en el Doctor**. De igual forma, sobre la intervención del Hospital Ryder en la obtención de ese consentimiento, el doctor Gratacós Díaz indicó:

> P. Continuamos Doctor. ¿qué consentimiento si alguno debería tomar el personal del Hospital Ryder a esta paciente?
>
> . . .
>
> . . .

---

[108] Véase, *Transcripción de Juicio en su fondo*, Vista del 31 de julio de 2017, Apéndice de la Petición de Certiorari, pág. 535.

[109] Íd., págs. 539-540.

R. **El hospital**, el personal del hospital, el personal de enfermería **no tiene como responsabilidad tomar consentimiento. Eso es responsabilidad del médico**. La responsabilidad del personal de enfermería es documentar que los permisos pertinentes estén tomados en el expediento médico. Y en este caso de esta paciente, el uso de [Misoprostol] requiere un permiso. La inducción requiere un permiso. Le toca al personal de enfermería revisar que en el expediente esto esté.

**Si este permiso no está en el expediento médico pues, entonces <u>no se debe proceder</u> con la orden médica hasta que el médico no complete esto.** (Énfasis suplido).[110]

En relación con la falta protocolos de inducción de partos o de uso de Misoprostol, el *Informe Pericial* del doctor Gratacós Díaz concluyó que la ausencia de esos protocolos "expuso tanto a la Sra. Aleicha Cruz, como a su bebé, a una inducción del parto **la cual no estaba medicamente indicada**, utilizando un medicamento que en este caso estaba **contraindicado y una dosis exagerada y contraindicada**". (Énfasis suplido).[111] Es de notar que el llamado clínico de inducir un parto queda bajo el criterio absoluto del Doctor, más no así de ninguna institución o empleados de esta.

A su vez, el perito sostuvo que

"[a]ntes de comenzar la utilización de [Misoprostol] **es responsabilidad del médico obtener un consentimiento informado donde se discute con la paciente sobre el plan de tratamiento.** Este consentimiento debe ser documentado en el expediente médico. Este consentimiento no aparece en el expediente médico de la Sra. Aleicha Cruz en el Hospital Ryder el 2 de junio de 2014. **Las enfermeras** a cargo del

---

[110] Íd., págs. 551-552.
[111]  Íd.

> **cuidado de la paciente <u>también</u> son responsables de <u>revisar</u>, antes de ejecutar una orden médica como lo es la utilización de [Misoprostol] de que no exista una contraindicación y que se haya tomado un consentimiento.** Nada de eso se hizo en el Hospital Ryder". (Énfasis suplido).[112]

Por otro lado, el doctor Gratacós Díaz aludió a un documento intitulado *Patient Safety Checklist* y mencionó que era importante no inducir un parto antes del tiempo requerido. **Ahora, <u>señaló que es el médico quien tiene la responsabilidad de explicarle al paciente las alternativas de tratamiento</u>.** Sin embargo, indicó que "[l]os hospitales tienen como norma, por las instituciones que los acreditan, que se tomen estas medidas para evitar que se hagan inducciones innecesarias".[113] Así, reiteró que los protocolos para seguir este tipo de procedimientos **son una práctica estandarizada de la medicina** y se encuentran en la **literatura médica** y han sido avalados por el *Colegio Americano de Obstetras y Ginecólogos.*[114]

Con relación al medicamento Misoprostol, el galeno explicó que cuando se trata de inducir el parto con ese medicamento, el *Colegio Americano de Obstetras y Ginecólogos*, así como la literatura médica, recomiendan una dosis de veinticinco (25) microgramos.[115] Explicó que es así, porque al subir la dosis a cincuenta (50) microgramos, el riesgo de

---

[112] Íd. pág. 106.

[113] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto de 2017, Apéndice de la Petición de Certiorari, pág. 645.

[114] Íd., pág. 646.

[115] Íd., pág. 650.

complicaciones incrementa. Sostuvo que, para administrar una dosis más alta, es necesario esperar cuatro (4) horas desde la primera administración.

En cuanto al proceso de solicitar el medicamento Misoprostol, el galeno explicó que, según su experiencia, <u>**es el doctor quien solicita el medicamento a la farmacia del hospital**</u>, la orden se procesa y la farmacia se lo envía o le indica si hay que hacer algún tipo de modificación en cuanto a dosis y hora de administración.[116] Particularmente, describió que en el caso del Misoprostol, al ser una tableta de cien (100) microgramos, el médico solicita la dosis de veinticinco (25) microgramos y es la farmacia la que envía el medicamento ya cortado en esa dosis. Para el médico es un *double check* de que lo están haciendo bien.[117] Entonces, cabe preguntarse, si los doctores son los encargados de solicitar los medicamentos a la farmacia y esta de enviarlos según se requirió o dosificado de otra forma, **¿a quién le corresponde el cotejo final antes de administrar tal medicación al paciente?** Sin lugar a duda, la verificación última de los medicamentos que se envían a sala para ser administrados recae exclusivamente en la responsabilidad del doctor. Es el facultativo médico, estrictamente según su juicio clínico, quien lidera y está a cargo del tratamiento que le brinda al paciente. Por ello, independientemente de que el doctor haya

---

[116] Íd., págs. 656-657.
[117] Íd.

solicitado la dosis correcta, o la farmacia le haya corregido la misma y así corregida se la haya enviado, al recibir finalmente la medicación es el galeno quien tiene la responsabilidad de cotejar en última instancia, y previo a la administración del medicamento, que éste y su dosis, son los que corresponden.

Por otra parte, según se desprende del expediente médico del Hospital Ryder, una vez se le administró el Misoprostol, la señora Cruz Flores comenzó a tener contracciones cada minuto, dolor severo y los latidos del bebé comenzaron a bajar. También, sostuvo que una de las complicaciones del Misoprostol es la taquisístole, o la presencia de contracciones cada minuto. Expresó que esas contracciones tienen efecto sobre la oxigenación del infante.

En cuanto al diagnóstico de *fetal distress*, indicó que el mismo se encuentra en múltiples ocasiones en el expediente médico de la peticionaria.[118] Esto se puede constatar también con los distintos testimonios vertidos en el juicio, como por ejemplo, el de la doctora Rivera Rodríguez, quien indicó que, según el expediente médico, la menor había nacido por cesárea debido a un *fetal distress*.[119] A su vez, el doctor Gratacós Díaz indicó que, debido al trazado fetal presentado, una vez

---

[118] Íd., pág. 686. Véase, *Expediente de Admisión del Hospital Ryder*, Apéndice de la Petición de Certiorari, pág. 235; *Labor Record-History and Physical Examination*, Apéndice de la Petición de Certiorari, pág. 237; *Delivery Report*, Apéndice de la Petición de Certiorari, págs. 238-239.

[119] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto de 2017, Apéndice de la Petición de Certiorari, pág. 512.

se administró el medicamento, la bebé sí tuvo *fetal distress* debido al uso contraindicado de Misoprostol y la inducción no indicada o mal hecha.

El doctor Gratacós Díaz sostuvo que, en este caso, se hizo una inducción de parto que estaba contraindicada y como consecuencia Abril nació prematura.[120] A su vez, al utilizar el medicamento en una dosis incorrecta ——tres veces mayor de lo recomendado——, ello provocó que la señora Cruz Flores desarrollara las complicaciones mencionadas.

Por otro lado, en su testimonio, el perito del recurrido, el doctor Roure Llompart, estableció que el punto de referencia que deben utilizar los médicos al momento de casos como el de autos es la **literatura médica**.[121] Expresó que las guías o protocolos son las guías del *Colegio Americano de Obstetricia y Ginecología*.[122] Indicó que los hospitales pueden ajustar esas guías de acuerdo con sus necesidades, pero deben mantenerse en la misma línea.[123] A su vez, sostuvo que las guías o protocolos no representan una manera única de hacer las cosas. No obstante, el mismo perito del recurrido reconoció que los hospitales tienen la facultad de tener sus propias guías **"para poderse medir y para que estén fácilmente disponible"**,[124] las cuales deben estar basadas en las guías

---

[120] Íd., pág. 686.
[121] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto de 2017, Apéndice de la Petición de Certiorari, pág. 788.
[122] Íd., pág. 860.
[123] Íd.
[124] Íd., pág. 858.

del *Colegio Americano de Obstetras*. Incluso, indicó que tales guías o protocolos, "normalmente permanecen en la sala de parto" con el propósito de que si un médico tiene alguna duda las pueda consultar.[125]

De otra parte, el doctor Roure Llompart explicó que un parto aumentado o *augmentation of labor* es un proceso en el que la paciente está de parto, pero de momento el proceso se detiene o aguanta.[126] A su juicio, la señora Cruz Flores sí estaba de parto, conforme al trazado de las contracciones de la peticionaria. En el contrainterrogatorio, **el perito coincidió que el uso de Misoprostol debía ser de 25 microgramos y luego de 50.**[127] **Aceptó que en el caso de la señora Cruz Flores no había indicaciones de inducir un parto.** Del análisis hecho por el perito sobre los latidos del bebé, concluyó que no hubo *fetal distress* porque la bebé tenía buena variabilidad y al nacer presentó un buen APGAR.[128] Finalmente, reiteró que los protocolos del hospital no son relevantes porque no era un caso de inducción de parto.

---

[125] Íd., pág. 863.

[126] Íd., pág. 864.

[127] Íd., pág. 973.

[128] No obstante, aunque el perito de la parte recurrida, testificó que no había ocurrido *fetal distress* en el caso, **éste fue impugnado en más de cinco ocasiones con el expediente médico, donde aparecía claramente el diagnóstico de *fetal distress* en diferentes instancias.** Este diagnóstico fue confirmado en múltiples páginas del expediente médico estipulado por las partes. Íd.

Ahora bien, a nuestro juicio, estas expresiones del doctor Roure Llompart confirman la importancia que tienen las guías o protocolos dentro de las instituciones hospitalarias. Aunque sus expresiones no indican que los protocolos de Misoprostol son requeridos, sí reconoce que el uso de Misoprostol puede estar supeditado a guías o protocolos con el fin de garantizar la uniformidad de cómo se utiliza el mismo entre los facultativos y por ende dentro de la institución hospitalaria. No obstante, de los testimonios de los peritos de ambas partes surge que en otras instituciones hospitalarias existen protocolos para el uso de Misoprostol, fundamentándose en las guías del *Colegio Americano de Obstetras*, las cuales recogen **las mejores prácticas de la profesión**.

Ahora bien, luego de examinar minuciosamente el expediente del caso de autos, a diferencia del Tribunal de Apelaciones, concluimos, en *primer lugar*, que **el Hospital Ryder fue negligente** al no revisar los documentos médicos de los peticionarios para constatar su consentimiento informado para la inducción del parto según requerido en la **literatura médica**[129] **como una buena práctica de la medicina** y al no

---

[129] Véase, *Informe pericial* del Dr. Gratacós Díaz, Apéndice de la Petición de Certiorari, pág. 76 (citando a *Inducción del Parto- Opinión de Comité del Colegio Americano de Obstetras y Ginecólogos*). Ahora bien, según constatamos, del expediente del caso de autos, solo surge el *Consentimiento para la Hospitalización* al momento de la admisión y el *Consentimiento para la Administración de Anestesia*. Sin embargo, es importante aclarar que incluso del consentimiento para la hospitalización firmado por la peticionaria se desprende una cláusula que establece que "[e]ntiendo que es costumbre en la medicina **no proceder**

revisar el expediente médico para constatar el consentimiento informado para el uso del medicamento Misoprostol. De igual forma, por no poseer protocolos para el manejo de este tipo de procedimientos y medicamentos. Máxime, cuando el *Colegio Americano de Obstetras* y otras instituciones hospitalarias recomiendan poseer protocolos para el uso y manejo de Misoprostol, por lo tanto, es un indicio claro de que el medicamento debe ser controlado con mayor rigor debido a las consecuencias de su uso contraindicado. En ese sentido, reiteramos, que ante la omisión del Hospital Ryder de no tener protocolos sobre la inducción de partos y el uso de Misoprostol, este no desplegó el grado de razonabilidad requerido, por una persona prudente y razonable, incumpliendo con **la obligación continua de <u>velar</u> por la salud de su paciente cuando está en sus facilidades** requerido por nuestro ordenamiento. En este caso, era evidente la necesidad de una política institucional —*enmarcada dentro de unas normas o guías*— que previera los riesgos probables de este tipo de procedimiento médico y sobre el uso del medicamento Misoprostol, en atención al peligro que acarrea su uso contraindicado.

---

**con un tratamiento particular que conlleve riesgo a un paciente** sin el consentimiento informado y específico del paciente. Todo paciente, tiene derecho autorizar o a rehusar, cualquier tratamiento que conlleve riesgo". No obstante, del expediente no surge un consentimiento informado sobre la inducción del parto o para el uso de Misoprostol, según establece la literatura médica. Véase, *Consentimiento para Hospitalización*, Apéndice de la Petición de Certiorari, pág. 342.

Según resolvimos en <u>Márquez Vega v. Martínez Rosado</u>, *supra*, de acuerdo con la teoría de responsabilidad corporativa, en los casos que un médico goce de privilegios en una institución hospitalaria, el hospital es responsable si incumple con el **estándar adecuado de atención que se le debe al paciente**, en garantizar su seguridad y bienestar mientras está en el hospital. Por esa razón, establecimos que un hospital debe velar por el bienestar de sus pacientes mediante la <u>**supervisión**</u> o **"manteniéndose al tanto"** (***monitoring***) **del trabajo de los referidos médicos e interviniendo, cuando ello sea posible, ante un acto obvio de impericia médica por parte de los mismos.** (Énfasis Suplido).[130]

Según expusimos, la existencia de un requisito de supervisión no implica que una institución hospitalaria deba tener guías o protocolos para todo riesgo imaginable que pudiera surgir en sus instalaciones como parte de las actividades de un médico que goza de privilegios. Mas bien, **se trata de un ejercicio de previsibilidad en atención a la mejor práctica de la medicina según esta ha sido generalmente reconocida por la profesión.** Es decir, es responsabilidad de los hospitales cumplir con un grado razonable de previsibilidad en estas situaciones. De esta forma observarían la conducta requerida para la consecución del

---

[130] *Márquez Vega v. Martínez Rosado*, supra, págs. 409-10.

mejor cuido y tratamiento de los pacientes que allí acuden. En este caso, era evidente la necesidad de una política institucional, enmarcadas en una normas o guías que previera los riegos probables de este tipo de procedimiento médico. A saber, la inducción de los partos y el uso del medicamento Misoprostol, en atención al peligro que acarrea su uso contraindicado.

En *segundo lugar*, reconocemos igualmente la responsabilidad en la que incurrió el doctor Flores Rivera. Si bien es cierto que los protocolos a los que hemos hecho referencia a lo largo de esta Opinión son más que útiles a la hora lidiar con este tipo de asuntos, ciertamente, las acciones que originaron la cadena de eventos que culminó en el fatídico desenlace del caso de epígrafe, sin duda, son atribuibles principalmente a las acciones del doctor Flores Rivera. Comenzando con la instrucción de inducir el parto sin razón médica alguna, el olvido u omisión de otorgar y recibir un consentimiento informado para trabajar con el cuerpo de la peticionaria en tan delicada labor, y hasta en la administración de dosis equivocadas de medicamentos sensitivos. Estos hechos, según reseñados y analizados en párrafos anteriores, ponen de manifiesto **la responsabilidad patente del doctor** en este caso.

En virtud de ello, si bien coincidimos con la determinación que el foro primario realizó al imputarle responsabilidad tanto al Doctor como al Hospital, nos vemos

en la obligación de modificar el porcentaje de responsabilidad, de manera que este refleje lo siguiente: setenta por ciento (70%) de responsabilidad atribuible al doctor Flores Rivera y treinta por ciento (30%) de responsabilidad al Hospital Ryder. Lo anterior, sin modificar de forma alguna las cantidades monetarias que previamente asignó a las partes.

**IV**

Por otro lado, al considerar el razonamiento del Tribunal de Apelaciones, sobre un alegado cambio de teoría del doctor Gratacós en su informe pericial, resulta meritorio expresarnos sobre los *addéndum* en este tipo de prueba documental y puntualizar algunos aspectos.

En el caso de autos, el perito de la parte peticionaria sometió su informe pericial el 14 de diciembre de 2015. Allí concluyó que la causa de los daños sufridos fue la inducción del parto y el uso del Misoprostol por el doctor Flores Rivera según la evidencia con la que se contaba al momento. Luego, durante el descubrimiento de prueba, la parte peticionaria, al ampliar su conocimiento sobre los hechos y circunstancias del caso, solicitó al Hospital Ryder mediante interrogatorio que entregara el protocolo de enfermería y de inducción de parto existente para la fecha de los hechos de la demanda. En respuesta a la solicitud, el Hospital Ryder envió a la peticionaria un protocolo del año 2016, indicando que era el único disponible. Así las cosas, el perito de la parte

peticionaria realizó un *addémdum* a su informe pericial, en el cual indicó que la ausencia de los protocolos fue la causa adecuada que provocó los daños sufridos por los peticionarios. Dicho *addéndum* fue debidamente sometido y aceptado por el foro de instancia, quien tuvo la oportunidad de aquilatar y valorar de primera mano toda la prueba sobre los hechos en disputa.

Ante este panorama, resulta meritorio recalcar que ha sido norma reiterada en nuestro ordenamiento que el descubrimiento de prueba debe ser uno **amplio y liberal**. No podemos olvidar que el propósito del descubrimiento de prueba es ampliar todas las posibles causas de los daños y a su vez conocer quiénes pueden ser responsables por los mismos. Después de todo, el proceso de descubrir prueba tiene como fin el poner al tribunal en posición de resolver de la manera más justa para todas las partes. Por consiguiente, resulta prudente establecer que **los *addémdums* pueden ser sometidos como prueba siempre y cuando se realicen en la etapa del descubrimiento de prueba. Quedará a discreción del juzgador en el foro de instancia, aceptarlos sin que necesariamente esto constituya un cambio de teoría.** De surgir alguna incongruencia entre el informe pericial y el *addéndum*, corresponderá al juzgador de los hechos la determinación sobre el valor probatorio que proceda de lo sometido a su consideración.

Considerando que el *addéndum* al informe pericial fue presentado durante la etapa del descubrimiento de prueba y que **el mismo fue debidamente aceptado por el foro de instancia***,* sería erróneo concluir que dicho *addéndum* constituye un cambio de teoría por parte del perito de la peticionaria. Resolver lo contrario constituiría una limitación al descubrimiento amplio y liberal que garantiza nuestro ordenamiento. A su vez, limitaría la discreción que posee el juzgador de instancia para manejar el descubrimiento y la apreciación de la prueba.

**V**

Por los fundamentos antes expuestos **se revoca** el dictamen del Tribunal de Apelaciones. En consecuencia, **se modifica** la *Sentencia* emitida por el foro de primera instancia, y así modificada, se reinstala conforme con lo pautado en esta Opinión.

Se dictará sentencia de conformidad.


                                        Edgardo Rivera García
                                           Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Aleicha Cruz Flores, et al<br><br>Peticionarios<br><br>v.<br><br>Hospital Ryder Memorial Inc., et al<br><br>Recurridos | CC-2019-0445 | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 2 de septiembre de 2022.

Por los fundamentos expuestos en la Opinión que antecede, la que se hace formar parte íntegra de la presente, se revoca el dictamen del Tribunal de Apelaciones. En consecuencia, se modifica la *Sentencia* emitida por el foro de primera instancia, y así modificada, se reinstala conforme con lo pautado en esta Opinión.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emite una Opinión de conformidad en parte y disidente en parte. El Juez Asociado señor Estrella Martínez emite la expresión de conformidad en parte y disidente en parte siguiente, a la cual se une el Juez Asociado señor Colón Pérez:

"Estoy de acuerdo con que hoy reiteremos que las instituciones hospitalarias tienen un deber continuo de velar por la seguridad, la salud y el bienestar de los pacientes que acuden a sus facilidades. Asimismo, concuerdo con que los hospitales tienen la obligación de formular, adoptar y hacer cumplir aquellas políticas institucionales que son requeridas por la buena práctica de la medicina en aras de satisfacer cabalmente las exigencias reconocidas por la profesión.

Resulta indudable que el hospital que le concede a un médico el privilegio de utilizar sus facilidades para atender a sus pacientes privados tiene, a su vez, el deber indelegable de velar por el bienestar de tales pacientes. En ese sentido, es importante que las instituciones hospitalarias seleccionen cuidadosamente los médicos a quienes le confieren el privilegio de utilizar sus facilidades, que se mantengan al tanto del trabajo que estos realizan e intervengan ante un acto obvio de impericia médica. La observancia de estas exigencias es indispensable, ya que el deber de cuidado hacia el paciente no es exclusivo del médico, sino que también le corresponde al hospital.

En la controversia ante nuestra consideración quedó establecido que el Hospital Ryder Inc. (Hospital Ryder) incumplió con esos postulados dado que, ante un cuadro de negligencia grave, no supervisó adecuadamente a un médico autorizado a utilizar sus facilidades.

Ahora bien, a pesar de que coincido con la desidia del Hospital Ryder en su obligación continua de velar por la seguridad, salud y bienestar de una paciente y su hija recién nacida, estoy en desacuerdo con la modificación del porciento de responsabilidad atribuido al hospital *vis à vis* el doctor ante el foro primario. Ello pues, a mi juicio, en este caso particular, la totalidad de las circunstancias demuestra que la distribución de responsabilidad que se le imputa al Hospital Ryder debió ser mayor al treinta porciento (30%) que hoy impone este Tribunal.

Y es que quedó establecido que la falta de protocolos para la inducción de partos o sobre la utilización del medicamento Misoprostol en el Hospital Ryder provocó: **(1)** una inducción que no estaba médicamente indicada; **(2)** la utilización de un medicamento que estaba contraindicado, y **(3)** la administración del medicamento en una dosis tres veces mayor a la requerida.

Además, la prueba pericial presentada en el Tribunal de Primera Instancia demostró que el personal de enfermería falló en corroborar que el doctor obtuviera el consentimiento informado de la paciente para la inducción del parto y la posterior utilización del medicamento en cuestión. Sin estos permisos en el expediente, el personal del Hospital Ryder estaba impedido de proseguir con la orden

médica. A su vez, estos incumplieron con su deber de revisar, antes de ejecutar la orden médica para la utilización del medicamento para inducir el parto, que este no estuviese contraindicado en la paciente.

Todo esto se agravó ante la ausencia en el Hospital Ryder de protocolos para la inducción del parto y la utilización del medicamento Misoprostol, a pesar de que estos son una práctica estandarizada de la medicina en las instituciones hospitalarias y se encuentran en la literatura médica. Máxime cuando la adopción y utilización de tales protocolos en los hospitales ha sido avalada, incluso, por el Colegio Americano de Obstetras y Ginecólogos.

De lo anterior se desprende que si el Hospital Ryder hubiese tenido un protocolo adecuado para la utilización del medicamento administrado, este podría haber identificado que tal medicamento estaba contraindicado en la paciente. Asimismo, según el protocolo, el departamento de farmacia hubiese tenido que notificar a la enfermera de turno y al médico de cabecera sobre esta situación y, seguramente, la paciente nunca hubiese recibido el medicamento que fue administrado incorrectamente.

Evidentemente, el Hospital Ryder falló en supervisar y monitorear el procedimiento que llevó a cabo el médico al inducir el parto. Ello, junto con la falta de protocolos, ocasionó que se alejara del estándar de atención y el deber continuo de velar por la seguridad, la salud y el bienestar de la paciente y su hija. Con este proceder, el Hospital Ryder potenció el desenlace de un suceso lamentable e irreparable que pudo haber sido evitado.

A la luz de lo anterior, soy del criterio que al Hospital Ryder se le debió imponer una responsabilidad mayor al treinta porciento (30%). Toda vez que una mayoría de este Tribunal estima lo contrario y, con ello, modifica la distribución realizada por el foro primario, **disiento.**"

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Aleicha Cruz Flores, et al<br><br>    Peticionarios<br><br>        v.<br><br>Hospital Ryder Memorial Inc.,<br>et al<br><br>    Recurridos | CC-2019-0445 | |

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de conformidad en parte y disidente en parte

En San Juan, Puerto Rico, a 2 de septiembre de 2022.

Una vez más, la violencia y el discrimen por razón de género se manifiesta e impone en nuestra sociedad. La violencia de género, en todas sus manifestaciones, es nefasta y repercute en la vida y cotidianidad de las personas. Por ello, estoy de acuerdo con que hoy comuniquemos el mensaje correcto a las instituciones hospitalarias de ejercer el cuidado y previsión conducente a la mejor práctica de la medicina obstétrica, según esta ha sido generalmente reconocida por la profesión médica.

Sin embargo, no estoy de acuerdo con invertir el porcentaje de responsabilidad del Hospital Ryder y el Dr. Luis Flores Rivera. El foro primario estaba en mejor posición de aquilatar la prueba y analizar la

controversia con la prueba documental, testifical y pericial que se presentó en el juicio. Aun si los tribunales apelativos estamos en la misma posición que el foro inferior para evaluar la prueba pericial, "debe[mos] abstener[nos] de intervenir respecto a las cantidades concedidas a menos que estas sean ridículamente bajas o exageradamente altas".[1] Estimo que la indemnización que concedió el tribunal de instancia por la negligencia del Hospital Ryder no es exageradamente alta por lo que merecía nuestra deferencia.

Ahora bien, suscribo esta Opinión no solo para consignar mi parecer sobre lo anterior sino además con el propósito de resaltar una realidad que afecta a todas las mujeres en este País y alrededor del mundo: **la violencia obstétrica.**

I

En este caso, se nos requirió resolver si el Hospital Ryder Memorial, Inc. (Hospital Ryder) debe ser encontrado incurso en responsabilidad civil extracontractual por impericia médica. Ello, al incumplir con su obligación de velar por la salud y bienestar de las y los pacientes que se encuentran en sus facilidades y al omitir formular, adoptar y hacer cumplir las políticas institucionales en aras de garantizar la salud y el bienestar de quienes allí se atienden. En específico, la controversia medular es si la referida institución hospitalaria se apartó de las normas de

---

[1] Véase, *Opinión Mayoritaria*, pág. 32.

cuidado que rigen su operación al momento de brindarle atención médica a una paciente embarazada.

Según destacó la Opinión Mayoritaria, a la Sra. Aleicha Cruz Flores se le indujo a **parto un mes antes de cumplir las cuarenta (40) semanas**, conforme a un curso natural y saludable de embarazo, **sin razón médica para ello**. La señora Cruz Flores gozaba de muy buen estado de salud y no presentaba dolores ni complicación alguna como resultado de su embarazo. No obstante, el doctor Flores Rivera la refirió al Hospital Ryder para inducirla a parto sin que este o la institución hospitalaria le requiriesen brindar su consentimiento informado y sin que se le explicaran las razones para inducirle el parto o los riesgos que ello podía conllevar.[2]

Una vez la señora Cruz Flores llegó al hospital para el procedimiento de parto, el doctor Flores Rivera comenzó el proceso de inducción rompiendo la membrana amniótica.[3] Como consecuencia, comenzó a salir líquido amniótico color verde y con trozos de meconio.[4] Ante ello, a la señora Cruz Flores se le administraron **cien (100) microgramos** de Misoprostol.[5] Acto seguido, comenzó a experimentar contracciones fuertes

---

[2] Según alegó la señora Cruz Flores, la única razón que se le brindó para inducirle el parto a las 36 semanas fue que el doctor Flores Rivera iba a disfrutar de unas vacaciones a la fecha de las 40 semanas de embarazo. Véase, *Demanda*, Apéndice, pág. 48.

[3] *Delivery Report*, Apéndice, pág. 238.

[4] Íb.

[5] Según recogió la *Opinión Mayoritaria*, el medicamento de Misoprostol es una prostaglandina que se utiliza para ablandar y dilatar el cuello uterino en casos como la inducción de un parto. También se utiliza para inducir abortos en embarazos tempranos donde el feto está muerto. Véase, *Opinión Mayoritaria*, pág. 5, escolio 9.

a cada minuto, razón por la cual se le realizó una operación de cesárea de emergencia.[6] En consecuencia, nació la bebé A.L.T.C. quien ingresó automáticamente a la Unidad de Intensivo Neonatal del Hospital Ryder. Asimismo, se identificó como bebé prematura, y posteriormente, le diagnosticaron más de una decena de condiciones médicas.[7] A los doce días de nacida, la bebé tuvo un arresto respiratorio y falleció.[8]

A raíz de los sucesos anteriores, la señora Cruz Flores y su pareja, presentaron una demanda en la que alegaron que el cuidado médico que recibió la señora Cruz Flores por parte de los codemandados, el doctor Flores Rivera y el Hospital Ryder Memorial, se apartaron de las normas que la práctica de la medicina exige.[9] Así, sostuvieron que esas desviaciones contribuyeron al cuadro clínico de hipertensión pulmonar persistente que desarrolló la bebé, la cual provocó su muerte.[10]

Como reseñaremos a continuación, las actuaciones del doctor Flores Rivera y del Hospital Ryder no solo fueron negligentes, sino que son características típicas de la violencia obstétrica. Identificar estas conductas como tal, resulta necesario para prevenir y tomar conciencia sobre las

---

[6] Véase, *Labor Record-History and Physical Examination*, Apéndice, pág. 237.
[7] Entre ellas: sepsis, hipertensión pulmonar arterial persistente, hipertensión pulmonar severa, fallo respiratorio, pulmonía, hemorragia pulmonar, disfunción cardiorrespiratoria, coagulopatía, anemia y convulsiones.
[8] Véase, *Transcripción de Juicio en su fondo*, Vista del 31 de julio 2017, Apéndice, pág. 479.
[9] Véase, *Demanda*, Apéndice pág. 51.
[10] Íb.

consecuencias que tienen en la salud pública. Por eso, me expreso de forma independiente para delinear los contornos de este tipo de violencia para así reconocer y asumir que – en muchas circunstancias- la salud de la mujer es objeto de apropiación y deshumanización.

## II

### A. Política pública sobre los derechos de la paciente

La Carta de Derechos y Responsabilidades del Paciente, Ley Núm. 194 de 25 de agosto de 2000, 24 LPRA secs. 3041-3058 (Ley Núm. 194-2000) estableció como política pública que las y los pacientes tendrán derecho a recibir servicios de salud de la más alta calidad, consistentes con los principios generalmente aceptados en la práctica de la medicina. Íb. sec. 3042.

Así, la clase médica, o cualquier profesional de la salud, tiene la obligación de proveer a sus pacientes información suficiente y adecuada, así como la oportunidad real de participar en forma significativa en las decisiones relacionadas con su cuidado médico y de salud, de manera que los y las pacientes puedan prestar su consentimiento a dichas decisiones. Íb. sec. 3047.

La información que debe proveer el o la profesional de la salud incluye, pero no se limita a: discutir opciones de tratamiento de una manera que el o la paciente entienda; la opción de rehusar recibir tratamiento; los costos, riesgos y probabilidades de éxito de dichas opciones de tratamiento o de rehusar tratamiento, y cualquier preferencia futura del

o la paciente, en caso de que en determinado momento pueda perder la capacidad de expresar su consentimiento a distintas opciones de tratamiento. Íb.

Por otra parte, la Ley de Acompañamiento durante el Trabajo de Parto, Nacimiento y Postparto, Ley Núm. 156 de 10 de agosto de 2006, 24 LPRA secs. 3691-3696 (Ley Núm. 156-2006) detalló los derechos que le cobija a la mujer embarazada durante el proceso del embarazo, parto y postparto. Entre ellos: (1) estar informada por una persona profesional de la salud sobre los procesos médicos que podría experimentar durante las etapas del embarazo, parto y postparto; (2) estar informada sobre la evolución de su parto y el estado de salud del o de la bebé; (3) participar activamente de las decisiones médicas que se tomen; (4) ser tratada con respeto, dignidad y de una manera individual y personalizada; (5) garantizar la privacidad e intimidad emocional de la madre durante todo el proceso; (6) evitar las prácticas invasivas y el suministro de medicamentos que no son justificados o requeridos por el estado de salud de la madre o del o la bebé, y (7) propiciar el parto natural. Íb. sec. 3692. El incumplimiento de estos y otros deberes relacionados resulta en la violación de los derechos y deshumanización de la mujer embarazada o en su etapa de postparto. Esta violación de derechos resulta en un discrimen por razón de género. A esta modalidad de discrimen por género se le conoce como violencia obstétrica.

**B. Violencia obstétrica**

El maltrato y la deshumanización que experimenta la mujer en los procesos de embarazo, parto y postparto es un tema que se ha desarrollado y debatido desde principios de este siglo en países de América Latina. Maria T.R. Borges, A violent birth: reframing coerced procedures during childbirth as obstetric violence, 67 Duke L.J. 827, 848 (2018).

El término violencia obstétrica no tiene una definición uniforme; de hecho, su uniformidad se obstaculiza por la subjetividad inherente a la forma en que las mujeres experimentan este tipo de violencia. Elizabeth Kukura, Obstetric Violence, 106 GEO. L.J. 721, 728 (2018).

Los indicadores básicos para identificar la violencia obstétrica de acuerdo a la Organización Panamericana de la Salud son los siguientes:

> [L]a apropiación del cuerpo y procesos reproductivos de las mujeres por [el] personal de [la] salud, que se expresa en un trato jerárquico deshumanizador, en un abuso de medicalización y patologización de los procesos naturales, trayendo consigo [la] p[é]rdida de autonomía y capacidad de decidir libremente sobre sus cuerpos y sexualidad. Asia Villegas Poljak, La violencia obstétrica y la esterilización forzada frente al discurso médico, Revista Venezolana de Estudios de la Mujer, 14 n.32 (2009) (citando a Género, Salud y Desarrollo en las Américas, Indicadores básicos, Organización Panamericana de la Salud, OPS, Fondo de Desarrollo de las Naciones Unidas para la Mujer, UNIFEM y Fondo de Población, UNFPA (2007)).

Así, la violencia obstétrica es un cúmulo de elementos y conductas que desvaloriza y deslegitimiza el proceso

reproductivo de las mujeres.[11] Sin embargo, se han podido identificar al menos tres tipos de conductas que realiza el personal sanitario que constituyen violencia obstétrica, estas son: (1) el abuso, (2) la coerción y (3) la falta de respeto. Kukura, supra, pág. 728.

El abuso se puede experimentar mediante cirugías forzadas, procedimientos médicos no consentidos o con consentimiento viciado, contacto sexual no deseado, entre otros. Íb., pág. 730. La cirugía forzada durante el proceso del parto es usualmente la cesárea. Íb. Según ha expresado la Organización Mundial de la Salud, la tasa de cesáreas de un país no debería pasar del 15% de los partos realizados. Véase, Anthony González Taveras, Parto humanizado como respuesta a la violencia obstétrica, 11 REV. Estudios Críticos D. 77, 83 (2015). Sin embargo, en el 2016 la tasa de cesáreas en Puerto Rico alcanzó el 46.1% de los partos realizados. Íb. Mientras que para el 2007 se alcanzó la tasa más alta de nacimientos por cesáreas registrada al momento, un 49.2% de todos los alumbramientos en la isla.[12] Esto refleja que Puerto Rico tiene una tasa porcentual mayor en

---

[11] Contextualizar este tipo de violencia "es importante porque el abuso en la atención obstétrica y ginecológica es un tipo de violencia que a menudo se deja fuera de la conversación sobre la violencia contra las mujeres. [L]a definición de la violencia obstétrica como un subconjunto de la violencia de género pone de relieve que también es un tipo de violencia estructural y, por lo tanto, debe abordarse de forma sistémica". Maria T.R. Borges, A violent birth: reframing coerced procedures during childbirth as obstetric violence, 67 Duke L.J. 827, 830 (2018) (traducción suplida).

[12] Véase, Proyecto del Senado Núm. 225 de 8 de marzo de 2021 para crear la Ley para el Acceso a la Información de estadísticas de Cesáreas en Puerto Rico, pág. 2.

nacimientos vía cesáreas que otras jurisdicciones, tales como: Reino Unido 31.2%, España 27.3%, Estados Unidos 31.7% e Italia 35%.[13] Lo que, a su vez, pudiera apuntar a que un porcentaje alto de procedimientos de cesáreas que se realizan en Puerto Rico son innecesarios y/o caprichosos.[14]

Por otro lado, el abuso también se refleja mediante procedimientos médicos no consentidos, **como la inducción del parto y el desprendimiento o la rotura de membranas**. Kukura, supra, pág. 734. Específicamente, esta forma de violencia obstétrica implica **la inducción al parto de forma artificial en una fecha determinada, sin que se le informe a la paciente los riesgos de la inducción o de los métodos alternativos**. Íb.

La violencia obstétrica también incluye la conducta sexual no deseada por parte del personal médico bajo el pretexto de un examen ginecológico. Algunas mujeres experimentan acercamientos y contacto físico durante el parto que equivalen a una violación sexual. Íb., pág. 735. Aunque los exámenes vaginales regulares no son necesarios durante el parto, las mujeres pueden ser sometidas a frecuentes penetraciones vaginales durante el procedimiento de parto, en ocasiones sin su consentimiento o conocimiento, por parte de las enfermeras o los enfermeros y del personal médico cuando comprueban la dilatación y la posición del cuello uterino. Íb.

---

[13] Íb.
[14] Íb.

La violencia obstétrica también se visibiliza en los comentarios y percepciones del personal médico hacia la figura de la mujer embarazada. En particular, se le acusa a la mujer embarazada, o en su periodo postparto, de ser sensibles al dolor o se le cuestiona su capacidad para tolerar el dolor sin necesidad de medicamentos. Íb., pág. 753. Además, este tipo de violencia se manifiesta en "los regaños, la suministración de medicamentos innecesarios cuando una mujer da a luz, evitar que esté acompañada, la falta de empatía y de información". Zulmarie Hernández-Bell, La Experiencia de Violencia Obstétrica en Mujeres Adultas Puertorriqueñas: Un Estudio Fenomenológico desde una Perspectiva de Género, 4(3) Revista Caribeña de Psicología, 259-271 (2020).

El efecto de no contextualizar o poner en relieve este tipo de violencia es que se trata como una mera controversia de impericia profesional cuando, en realidad, **es un asunto de género que debe ser estudiado y contemplado desde la igualdad de derechos y la dignidad del ser humano**. Véase, Borges, supra, pág. 835. En esencia:

> [w]hat makes coerced medical procedures in childbirth, and other types of obstetric violence, different from other medical battery is that they are a type of gender-based violence. This is a type of gendered violence because its victims are primarily women and its origins are traceable to "how women (and their (dis)abilities) are perceived and perceive themselves in Western patriarchal societies." Therefore, [although] it has much in common with the more general experience of alienation and objectification within medicalization ..., obstetric violence appears to be unique in being

directed almost exclusively at women and being experienced and interpreted by women mostly as gender violence, an affront to and banishment of their otherwise healthy, powerful, sexual, and creative embodied subjectivities. That women are the primary victims of obstetric violence follows from the fact that pregnancy is--by and large--a uniquely female experience. Íb., pág. 853.

La categorización es particularmente importante, pues sirve para condenar la conducta constitutiva de violencia obstétrica, así como para regular las políticas públicas dirigidas a erradicar toda manifestación de discrimen y violencia por razón de género.

En Venezuela y Argentina, así como en algunos estados mejicanos, se ha enmarcado la violencia obstétrica como un asunto jurídico-legal el cual ha propiciado "una gama de recursos contra la conducta, incluyendo las quejas administrativas, el arbitraje médico especializado y las quejas ante las comisiones federales y estatales de derechos humanos". Íb., pág. 848. (traducción suplida). Todo ello sirve para pautar y establecer una política pública en pro de los derechos de las mujeres.

### III

A la señora Cruz Flores se le indujo a parto cuatro semanas antes de la fecha indicada, sin razón médica para ello. Peor aún, la inducción de parto fue provocada por medicamentos que agilizaron el proceso de dilatación. En específico, se le administró una dosis de Misoprostol tres veces mayor a la indicada.

Según explicó el perito, Dr. José A. Gratacós Díaz, el

Colegio Estadounidense de Obstetras y Ginecólogos **recomienda una dosis de 25 microgramos** de Misoprostol para el parto, puesto que una dosis mayor incrementa el riesgo de complicaciones.[15] De necesitar administrar una dosis mayor a la indicada de 25 microgramos, es necesario esperar 4 horas desde la primera administración.[16] El doctor Gratacós Díaz declaró que en su experiencia es el médico quien solicita el medicamento a la farmacia del hospital, la orden se procesa y la farmacia le indica si hay que hacer algún tipo de modificación en cuanto a dosis y hora de administración, si existe alguna discrepancia.[17]

Según se probó, la causa próxima de la muerte de la bebé A.L.T.F. fue la administración contraindicada del medicamento Misoprostol, la cual le produjo una multiplicidad de condiciones que —a sus 12 días de nacida— le ocasionaron la muerte.[18] Al examinar la conducta tanto del médico como del hospital, vemos que el doctor Flores Rivera: (1) indujo a parto a la señora Cruz Flores de forma prematura y sin razón médica conocida; (2) incumplió con el deber de obtener el consentimiento informado de la paciente para el parto; (3) no obtuvo un consentimiento informado para suministrarle el medicamento Misoprostol y los riesgos a los que se exponía, y (4) ordenó una dosis contraindicada del medicamento que, junto a otros factores, causó la muerte de

---

[15] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto de 2017, Apéndice del *Certiorari*, pág. 650.
[16] Íb.
[17] Íb., págs. 656-657.
[18] Véase, *Opinión Mayoritaria*, pág. 39.

la bebé.

Ahora bien, el Hospital Ryder, a través de su personal: (1) faltó a su deber de corroborar que la señora Cruz Flores hubiera rendido un consentimiento informado para la inducción del parto, según la literatura médica;[19] (2) omitió validar que en el expediente médico existiera el consentimiento informado de la señora Cruz Flores para el uso del medicamento Misoprostol;[20] (3) no contaba con guías o protocolos que normalmente permanecen en la sala de parto para que los doctores y las doctoras lo estudien en caso de tener alguna duda,[21] y (4) tampoco contaba con guías ni protocolos para la administración del medicamento Misoprostol. Por lo anterior, la farmacia del hospital despachó incorrectamente el medicamento Misoprostol en una dosis **tres (3)** veces mayor de la aceptada para partos. Peor aún, falló al no supervisar, a través de las enfermeras a cargo del cuidado de la paciente, que el medicamento que estaba administrándose no fuera en una dosis **excesiva y contraindicada**.

Por lo expuesto, el foro primario encontró probado —amparado en el testimonio del doctor Gratacós Díaz— que la causa de los daños de la señora Cruz Flores fue la negligencia del Hospital Ryder al no contar con un protocolo

---

[19] Véase, *Informe pericial* del Dr. Gratacós Díaz, Apéndice del *Certiorari*, pág. 76 (citando a *Inducción del Parto- Opinión de Comité del Colegio [Estadounidense] de Obstetras y Ginecólogos*).
[20] Véase, *Consentimiento para Hospitalización*, Apéndice del *Certiorari*, pág. 342. Véase también: *Opinión Mayoritaria*, págs. 42-43.
[21] Véase, *Transcripción de Juicio en su fondo*, Vista del 1 de agosto de 2017, Apéndice del *Certiorari*, pág. 863.

de inducción de parto ni de uso de Misoprostol, entre otros. El Hospital Ryder **tenía el deber de contar con un protocolo para fiscalizar y manejar de manera diligente los medicamentos que se despachan de su farmacia para ser administrados por las doctoras y los doctores que operan en su institución**. Así lo destacó la Mayoría de este Tribunal al sostener que:

> [E]l *Colegio [Estadounidense] de Obstetras* y otras instituciones hospitalarias recomiendan poseer protocolos para el uso y manejo de Misoprostol, por lo tanto, es un indicio claro de que el medicamento debe ser controlado con mayor rigor debido a las consecuencias de su uso contraindicado. **En ese sentido, reiteramos, que ante la omisión del Hospital Ryder de no tener protocolos sobre la inducción de partos y el uso de Misoprostol, estos no desplegaron el grado de razonabilidad requerido, por una persona prudente y razonable, incumpliendo con la obligación continua de velar por la salud de su paciente cuando está en sus facilidades** requerido por nuestro ordenamiento. En este caso, era evidente la necesidad de una política institucional —*enmarcada dentro de unas normas o guías*— que previera los riesgos probables de este tipo de procedimiento médico y sobre el uso del medicamento Misoprostol, en atención al peligro que acarrea su uso contraindicado.[22]

No obstante, la Mayoría de este Tribunal, aun entendiendo que el Hospital Ryder fue negligente, modificó los porcentajes de responsabilidad que el foro primario adjudicó. Para ello se limitó a expresar, en un párrafo, que el doctor Flores Rivera fue el principal responsable de los eventos fatídicos porque: indujo a parto a la señora Cruz Flores sin razón medica alguna; omitió otorgar y recibir un

---

[22] Véase, *Opinión Mayoritaria*, págs. 43-44 (énfasis suplido).

consentimiento informado y administró la dosis equivocada del medicamento Misoprostol.[23] Lo anterior, a su juicio, justificaba modificar la determinación del foro primario para responsabilizar en 70% al doctor Flores Rivera y en 30% al Hospital Ryder. No estoy de acuerdo con esa modificación y estimo, respetuosamente, que no se sustenta en el expediente del caso.

Como sabemos, en ausencia de error manifiesto, prejuicio, pasión o parcialidad, no debimos intervenir con las conclusiones de derecho que realiza el foro primario. Aun evaluando *de novo* la evidencia pericial, era forzoso concluir que la negligencia del Hospital Ryder en este caso fue extensa y, como adjudicó el Tribunal de Primera Instancia, incluso mayor que la del doctor Flores Rivera. En ese sentido, no había razón para modificar a nivel apelativo la adjudicación de responsabilidad que hizo el foro primario. De acuerdo con la totalidad del expediente, la responsabilidad que adjudicó el foro primario fue razonable.

Adviértase que, "**los tribunales apelativos deberán abstenerse de intervenir respecto a las cantidades concedidas** a menos que éstas sean ridículamente bajas o exageradamente altas, **ello fundado en criterios de estabilidad y de respeto a los tribunales de primera instancia**". S.L.G. Rodríguez v. Nationwide, supra, citando a Urrutia v. A.A.A., 103 DPR 643, 647 (1975). La Mayoría

---

[23] Íb., pág. 45.

falla en exponer de forma clara y expresa por qué la responsabilidad que adjudicó el foro primario era incorrecta. Incluso, no fue un error que levantó el Hospital Ryder en su petición de *certiorari* o un asunto que hayan discutido las partes en sus alegatos.

En ausencia de explicaciones y análisis concreto sobre por qué se debió modificar el porcentaje de responsabilidad, me es imposible suscribir esa determinación. No considero que la cantidad que el foro primario le imputó al Hospital Ryder por su negligencia, $304,970.72, haya sido exageradamente alta.[24] Máxime cuando el resultado de su negligencia culminó en la muerte de una bebé luego de 12 días de sufrimiento, tanto de la menor como de sus progenitores.

Por último, considero apremiante visibilizar que, la sobre medicalización a la cual fue expuesta la señora Cruz Flores y la falta de empatía en su proceso de embarazo es una de las manifestaciones de violencia de género en su modalidad de violencia obstétrica. Cabe señalar que, según alegó la señora Cruz Flores, la razón para inducirla a parto a las 36 semanas se debió a que su doctor estaría de vacaciones para la fecha en la cual esta cumpliría sus 40 semanas de gestación.[25] Ello sin haber obtenido un consentimiento informado y sin explicarle los riesgos sobre su salud y la de su bebé.

---

[24] Véase, *Sentencia del Tribunal de Primera Instancia*, Apéndice del *Certiorari*, págs. 161-162.
[25] Íb., pág. 3.

La mujer embarazada goza de unos derechos para garantizar su integridad y dignidad durante su proceso de gestación. Así, esta debe ser tratada con respeto, dignidad y de una manera individual y personalizada. Además, se tiene que evitar las prácticas invasivas y **el suministro de medicamentos que no son justificados o requeridos por el estado de salud de la madre o del o la bebé**, entre otros. Véase, Ley Núm. 156-2006, supra, sec. 3692. A la señora Cruz Flores no se le garantizaron estos derechos. Ante ello, es ingenuo pensar que este asunto no está centrado en concepciones paternalistas de la salud. Y es que la falta de perspectiva de género y de cuidado y diligencia en un área médica intrínsicamente relacionada con la mujer, nos cuesta la vida y la de nuestros bebés. Es reprochable que una mujer tenga que pasar por un proceso deshumanizante durante su embarazo, parto y/o postparto por la falta de cuidado mínimo de los y las profesionales de la salud en quienes los y las pacientes depositan su confianza.

Enfatizo y sostengo que "**[n]o se trata de decir que somos iguales sino de actuar como si lo fuésemos**".[26] No podemos —ni debemos— ignorar que el discrimen —en todas sus manifestaciones— se exterioriza en todo tipo de actividad humana. La profesión médica no está exenta de ello. Es por ello por lo que, el campo de la salud —**específicamente en**

---

[26] Gloria Poyatos, véase, María José Lahora, *La educación es la vacuna frente a la violencia de género*, El Diario, 5 de octubre de 2017, https://www.eldiario.es/canariasahora/sociedad/gloria-poyatos-educacion-vacuna-violencia-de-genero_128_3148756.html.

**campos inherentes a la salud de la mujer**, como lo sería la ginecología y obstetricia— **debe perseguir una metodología que exalte el valor de cada ser humano basado en un enfoque de perspectiva de género.**

**IV**

Por los fundamentos expuestos, estoy conforme con revocar al Tribunal de Apelaciones y responsabilizar al Hospital Ryder por su negligencia clara y contundente en este caso. Estoy conforme además con establecer que los hospitales **tienen la obligación** de formular, adoptar y cumplir con las políticas institucionales conducentes a la mejor práctica de la medicina. No obstante, difiero de la determinación de una Mayoría de invertir los porcentajes de responsabilidad entre el doctor Flores Rivera y el Hospital Ryder.

Maite D. Oronoz Rodríguez
Jueza Presidenta